907 F.2d 1366
 59 USLW 2037, 61 Ed. Law Rep. 845
 GREGOIRE, Harry, Urbany, David, Irwin, Scott and Dietsch,
Herman and Miller, Rich and Campus Crusade For Christ, Inc.
v.
CENTENNIAL SCHOOL DISTRICT and White, Ronald Y., in his
official capacity as Supervisor of Secondary
Education for the Centennial School
District (Two Cases).
Appeal of CENTENNIAL SCHOOL DISTRICT.
 Nos. 89-1658, 89-1692.
 United States Court of Appeals,
Third Circuit.
 Argued Jan. 31, 1990.
Decided June 22, 1990.
 
 John Phillip Diefenderfer, Stucker and Yates, Newton, Pa., Rodney A. Smolla (argued), Williamsburg, Va., for appellant Centennial School Dist.
 Peter M. Hileman, Drake, Hileman & Davis, Doylestown, Pa., Jordan W. Lorence (argued), Cimron Campbell, Mark N. Troobnick, Washington, D.C., Wendell R. Bird, Law Office of Wendell Bird, Atlanta, Ga., for cross-appellants Harry Gregoire, David Urbany, Scott Irwin, Herman Dietsch, Rich Miller and Campus Crusade for Christ, Inc.
 Before STAPLETON and MANSMANN, Circuit Judges and KOSIK, District Judge.*
 OPINION OF THE COURT
 MANSMANN, Circuit Judge.
 
 
 1
 In these cross appeals we are asked to resolve a direct conflict, of constitutional proportions, between a public school district and a religious organization, over the use of school facilities. The dispute comes to us from a final order of the district court granting a permanent injunction which enjoined the Centennial School District from refusing to open the facilities of the William Tennent High School to groups wishing to engage in religious speech. Centennial appeals the grant of this permanent injunction, claiming that it is not constitutionally required to open its facilities and, in fact, is mandated by the establishment clause to exclude at least certain types of religious speech. The beneficiary of the permanent injunction ("Student Venture") cross appeals on the ground that the district court stopped short; it contends that the district court erred when it did not include worship and distribution of religious literature within the mandate of the injunction. Because we find that Centennial, by its policy and practice, created a designated open forum and that the establishment clause is not violated by Student Venture's use of the school facilities, we will affirm the grant of the permanent injunction and will remand this matter to the district court to modify the injunction to include these additional categories of speech.
 
 I.
 
 2
 This dispute arose when Student Venture, an evangelical Christian Youth Organization which is a subsidiary of the Campus Crusade for Christ, Inc., was denied permission to rent the auditorium of the William Tennent High School for the evening of October 31, 1987. Student Venture sought use of the auditorium for a performance of a well-known illusionist/magician, Andre Kole. Kole often appears as a traveling representative for Campus Crusade. He performs and then, after an intermission when anyone may leave, he delivers an account of his investigation of the miracles of Christ and how his discovery that Jesus Christ was who he claimed to be changed the course of Kole's life.
 
 
 3
 The Centennial School District denied Student Venture's request to use the auditorium, citing School District Policy 6.2.D which stated that "Pennsylvania law specifically prohibits the use of school facilities for religious services, instruction, and/or religious activities."[1] Student Venture then filed suit in the U.S. District Court for the Eastern District of Pennsylvania, claiming that denial of the use of the facility violated its first amendment freedoms of speech and assembly, the fourteenth amendment's equal protection clause, and both the free exercise and establishment clauses of the first amendment.
 
 
 4
 On October 28, 1987, the district court issued a preliminary injunction enjoining Centennial from refusing to rent public school facilities to groups or individuals solely because of the religious content of their speech. Centennial was also enjoined from refusing to rent to Student Venture and the Kole performance went forward on October 31st.
 
 
 5
 The district court's issuance of the preliminary injunction was based on the conclusion that Centennial had created an "open forum" for free speech and assembly at its school facilities by renting them to a wide range of community groups. Given this open forum, Centennial could not refuse to rent to a group solely because of the religious content of the group's message. Gregoire v. Centennial School District, 674 F.Supp. 172, 179 (E.D.Pa.1987) aff'd without opinion, Appeal of Centennial School Dist., 853 F.2d 917, 918 (3d Cir.1988).
 
 
 6
 On March 8, 1988, Centennial revised its guidelines for facilities use. The new policy purports to limit access to those organizations, groups, and activities which are compatible with the mission and function of the school system. The revised policy does not permit the use of high school facilities for religious services and imposes a ban on the distribution of religious literature.
 
 
 7
 On the ground that it would request use of the Centennial facilities again for religious purposes, Student Venture sought to have Centennial's facilities use policy enjoined and a permanent injunction issued prohibiting Centennial from preventing its access to school facilities based on the religious content of its message. The district court granted permanent injunctive relief on November 30, 1988, relying again on the open-forum analysis; Gregoire v. Centennial School District, 701 F.Supp. 103 (E.D.Pa.1988). Centennial appeals from this final injunctive order.
 
 
 8
 Following the grant of injunctive relief, Student Venture filed a Motion for Clarification in the district court, asking that the court's order be amended to enjoin Centennial from prohibiting religious "worship" as well as religious "speech" and from barring distribution of religious literature at school facilities. On July 25, 1989, the district court denied this motion and Student Venture appeals.
 
 
 9
 These appeals require that we resolve complex issues of constitutional law, balancing a claimed violation of first amendment rights against a substantial first amendment defense. Where, as here, the facts are not in dispute and the parties challenge the choice, interpretation, and application of legal precepts, our review is plenary. Universal Minerals, Inc. v. C.A. Hughes & Co., 669 F.2d 98, 101-02 (3d Cir.1981). Recognizing that our decision will have significant import for school districts throughout this circuit, we turn to the issues presented on appeal.
 
 II.
 
 10
 There is no question that religious discussion and worship are forms of speech and association protected by the first amendment. Widmar v. Vincent, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981). There is also no question that Centennial seeks to exclude Student Venture and other religious organizations from its facilities based on the content of their speech.
 
 
 11
 We recognize at the outset that a school district is under no obligation to open its facilities to expressive activity by outsiders. "The state, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated." Perry Educ. Assn. v. Perry Local Educators' Ass'n., 460 U.S. 37, 46, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983). It is when the government opens facilities not generally available to the public that legal questions relating to equal access arise.
 
 
 12
 This established, we turn our focus to the issue at the very center of this litigation: what are the legal characteristics of the forum created by the school district at William Tennent High School? Limitations which the government may lawfully place on classes of speech vary, depending upon whether the relevant forum is determined to be a traditional open forum, a public forum created by government designation or a non-public forum.
 
 
 13
 The "traditional public forum" has been defined in terms of places such as streets or parks which "have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." Hague v. CIO, 307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939). Regulation of speech in a traditional public forum must pass muster under a strict scrutiny analysis; the regulation must be narrowly drawn to serve a compelling state interest. Carey v. Brown, 447 U.S. 455, 461, 100 S.Ct. 2286, 2290, 65 L.Ed.2d 263 (1980).
 
 
 14
 A "designated open public forum" is created when public property is intentionally opened by the state for indiscriminate use by the public as a place for expressive activity. A state is not required to maintain the open character of the facility indefinitely. Perry, 460 U.S. at 46, 103 S.Ct. at 955. While the facility is open, however, content-based regulation of speech is subject to the same strict scrutiny analysis applied in the traditional public forum.
 
 
 15
 The third forum category recognized in the first amendment context is the "non-public forum." This forum exists when publicly-owned facilities have been dedicated to use for either communicative or non-communicative purposes but have never been designated for indiscriminate expressive activity by the general public. United States Postal Serv. v. Council of Greenburgh, 453 U.S. 114, 101 S.Ct. 2676, 69 L.Ed.2d 517 (1981). Content-based regulation in this category is examined under the "reasonable nexus" standard. "Control over access to a non-public forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." Cornelius v. NAACP Legal Defense & Educ. Fund, 473 U.S. 788, 806, 105 S.Ct. 3439, 3451, 87 L.Ed.2d 567 (1985).
 
 
 16
 Neither party before us argues that the William Tennent High School facilities constitute a traditional public forum. The parties join issue over whether Centennial has created a designated open forum, thus implicating strict scrutiny of its decision to exclude Student Venture, or whether it has, instead, maintained a closed forum in its high school facilities from which content-based exclusions may be made so long as there is some rational basis for the exclusion. Centennial argues that elementary and secondary schools occupy a unique status for purposes of the first amendment and that courts have been reluctant to characterize either as an open forum.
 
 
 17
 In order to resolve this conflict, we look to those cases in which courts have undertaken public forum analysis to fix the appropriate standard of constitutional review. While the parameters of the public forum doctrine are, at the edges, imprecise, we believe that the line of cases in which this doctrine has been developed and applied requires a finding that Centennial has created a designated open forum in the William Tennent High School facilities and that its content-based exclusion of Student Venture's expressive activities must be examined against the strict scrutiny standard.
 
 III.
 
 18
 The Supreme Court in Perry and in Cornelius validated the use of forum analysis to achieve a balance between the government's interest in limiting the use of its property and the interests of those seeking access. Cornelius, 473 U.S. at 800, 105 S.Ct. at 3447. In these cases, the Court identified several factors to be considered in determining whether a particular forum should be categorized as open or closed. We first examine these factors in general terms in order to establish a framework for the evaluation of this case.
 
 
 19
 The first relevant factor is governmental intent. We must evaluate "the policy and practice of the government to ascertain whether it intended to designate a place not traditionally open to assembly and debate as a public forum." Id. at 803, 105 S.Ct. at 3449. The nature of the property and its compatibility with expressive activity provide additional information bearing on intent. Id. at 802, 105 S.Ct. at 3448 (intent to create a public forum will not be inferred when the nature of the property is inconsistent with expressive activity).
 
 
 20
 A second factor relevant to categorizing a forum as open or closed is the extent of use granted. We must determine, by examining Centennial's policy and practice, whether use of its facilities is open to "all comers" or whether it has been limited by well-defined standards tied to the nature and function of the forum. Perry, 460 U.S. at 46-47, 103 S.Ct. at 955-956.
 
 
 21
 Consistency in granting or refusing access to the forum is also important to proper classification. Any permission procedure and its application to similarly situated speakers must be considered in evaluating consistency. See Cornelius, 473 U.S. at 804-05, 105 S.Ct. at 3450-51 (consistent application of requisite permission procedure and lack of evidence suggesting that granting permission was merely ministerial were factors in finding closed forum).
 
 
 22
 Using the Supreme Court's forum guidelines as a framework for analysis, we turn to the facts of this case in order to determine whether the district court erred in concluding that Centennial created a designated open forum in the facilities of the William Tennent High School.IV.
 
 A.
 
 23
 Our first focus in categorizing the forum is on the school district's intent in opening its high school facilities to outside groups.[2] Both Perry and Cornelius make clear that "[t]he government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a non-traditional forum for public discourse." Cornelius, 473 U.S. at 802, 105 S.Ct. at 3449. We are directed to examine Centennial's policies, its practice, the nature of the high school property, and the compatibility of the property with expressive activity in order to determine the government's intent. Id. We turn first to Centennial's facilities use policy.
 
 
 24
 The policy in effect at the time of Student Venture's application for rental listed the following groups as qualifying for use of Centennial's facilities without charge:
 
 
 25
 1. community youth groups under proper supervision,
 
 
 26
 2. staff groups,
 
 
 27
 3. home and school and/or parent/teacher associations,
 
 4. civic and cultural organizations, and
 
 28
 5. booster organizations.
 
 
 29
 Other organizations were able to use school facilities on payment of a fee. Pursuant to this policy, Centennial granted building access to over sixty-five groups, including the Bloodmobile, scouting groups, YMCA, cheerleaders, dance groups, twirlers, the symphony, and to other groups for testing and photography sessions. The building was also used as a meeting place for parent groups, the County Board of Elections, and at least two labor unions. Adult education and college classes were held in the school classrooms in the evening. Centennial summarized use of its high school facilities during the 1986-87 school year as follows:
 
 
 30
 From the foregoing it can be seen that the facilities of the Centennial School District continue to be used extensively by the community.... The buildings and grounds of Centennial will continue to be made available to all groups in accordance with the [facility use policy].
 
 
 31
 The only explicit exclusion to this wide access policy was found in Regulation B.17 which imposed a ban on the use of school facilities for religious purposes. Despite this prohibition, Centennial permitted religious courses in its adult education program, offering instruction in many areas including metaphysics and meditation, psychic abilities, tarot, and parapsychology.[3]
 
 
 32
 It was while this policy was in effect that Student Venture sought and was denied access to the high school auditorium based on the religious content of its proposed message. Student Venture then sought a preliminary injunction which was granted by the district court.
 
 
 33
 Pending consideration of a permanent injunction, Centennial revised its facilities use policy. This revised policy, in effect at the time of the district court's issuance of the permanent injunction, is still in use.
 
 
 34
 This current policy permits the following groups, among others, to use its facilities:
 
 
 35
 Centennial resident civic, cultural and service organizations having a majority of Centennial resident membership and/or an on-going connection with the Centennial community.
 
 
 36
 a. Civic: Centennial neighborhood associations organized for the purpose of discussion of neighborhood affairs.b. Cultural: Centennial resident music, artistic, player associations organized for the purpose of rehearsal, performance of music compositions, plays or art displays.
 
 
 37
 c. Centennial Resident Service Organizations: Rotary, Kiwanis, Lions, Jr. Chamber of Commerce and like non-sectarian service organizations.
 
 
 38
 The policy also permits school facilities to be used by "community based employee associations and labor unions (limited to members only) for meetings only" and "commercial profit making ventures which charge admission or sell tickets for the staging of plays and/or musical performances suitable for general audiences." Adult education and college classes are also conducted at the school. The revised policy states that "persons or groups seeking an 'open forum' for free expression of ideas may make special arrangement to rent classroom space ... to teach such ideas in an objective manner through the Evening School Director."[4]
 
 
 39
 Section V of the revised policy also creates a limited open forum immediately after school for student participation in accordance with the terms of the Equal Access Act, 20 U.S.C.A. Secs. 4071 et seq.[5] The policy reads in part:
 
 A. Student Participation
 
 40
 A 'limited open student forum' (meeting) may be requested by any secondary student or students enrolled in the Centennial school district who desire(s) to voluntarily initiate a meeting ... in order to peacefully and with appropriate decorum discuss religious, political, philosophical or other topics which are not related to the curriculum, and wherein the School District or its employees will not be involved in any way in such sponsorship or discussion....
 
 
 41
 B. Non-School Person or Non-School Group Participation in the Limited Student Forum
 
 
 42
 1. No non-school person or non-school group shall be admitted to any limited open student forum without the written invitation and consent of the student or students initiating the meeting and advance school board approval
 
 
 43
 ....
 
 
 44
 2. Any non-school person or non-school group seeking to participate in any way in the open student forum shall provide the required certificate of insurance....
 
 
 45
 While the revised policy explicitly provides for religious discussion in several contexts, it also retains clauses purporting to exclude certain categories of religious speech:
 
 
 46
 c. In any event, religious service (defined to include the invocation of, worship to, prayer to, or adoration of a diety [sic] is prohibited.
 
 
 47
 d. The sale or distribution of Bibles, testaments, scriptures or religious literature is prohibited.
 
 
 48
 Although Student Venture programs such as the Kole performance arguably do not fall within the specific ban of the new policy, Centennial has effectively excluded these by including in its policy clause "(1c)" which effectively denies auditorium rental to non-profit and charitable organizations. Centennial admits that this "non-profit" language is designed to exclude programs such as the one previously sponsored by Student Venture.
 
 
 49
 Centennial contends that its policies clearly establish that it did not intend to designate an open forum in its high school facilities. Centennial argues that while it has created limited fora in certain contexts, its overall policy evinces a clear intention to maintain a closed forum with facilities access restricted to those groups whose purpose is consistent with the educational mission of the school and its functional place in the community. Centennial asserts that this intent, as expressed in its policy, must weigh in favor of our finding a closed forum at William Tennent High School.
 
 
 50
 While the Supreme Court in Perry, and Cornelius opined that intent, as evidenced by a government's statements, is a factor to be considered in forum classification, it also made it clear that the forum inquiry does not end with the government's statement of intent. To allow, as would the dissent, the government's statements of intent to end rather than to begin the inquiry into the character of the forum would effectively eviscerate the public forum doctrine; the scope of first amendment rights would be determined by the government rather than by the Constitution. Any forum classification must be rooted in the facts of the particular case; forum classification "should be triggered by what a school does, not what it says." Board of Education v. Mergens, --- U.S. at ----, 110 S.Ct. at 2369 (quoting 130 Cong.Rec. 19222 (1984) (statement of Sen. Leahy)). Cornelius and Perry direct that we look, therefore, not only at what Centennial says in its policy but at how that policy has been applied. Policy and practice are relevant in determining the government's intent. See, Perry, 460 U.S. at 37, 103 S.Ct. at 948 and Cornelius, 473 U.S. at 802, 105 S.Ct. at 3448.
 
 
 51
 Centennial contends that, despite having granted access to many diverse groups, it did not intend to create an open forum; it created instead a closed forum with access properly restricted to those groups whose purpose is consistent with the educational function and mission of the school. Centennial takes the position that the first amendment is not offended by reasonable content classifications rationally related to this mission. In formulating this argument Centennial relies primarily on Perry. In Perry, the school district granted access to the interschool mail system and teacher mailboxes to the teachers' duly elected bargaining representative while denying access to a rival union. The school district had allowed the mail system to be used by parochial schools, church groups, the YMCA and cub scout groups. The Supreme Court concluded that the school mail facilities constituted a closed forum and upheld the school district's content-based regulation on the use of the facilities.
 
 
 52
 Centennial argues that the access it grants to outside groups is limited to groups "of exactly the same character" as those in Perry. It has, it says, limited a non-public forum to activities compatible with the intended purpose of the property. The content-based classification imposed is said to be necessary to preserve neutrality in the public school setting. Centennial argues in its brief that "[s]chools have a powerful interest in rising above religious and political contests.... [S]chools must jealously guard against both the practice and appearance of religious, racial or political partisanship."
 
 
 53
 We recognize the accuracy of Centennial's conclusions regarding appropriate content restrictions in a closed forum but believe, however, that the breadth of access granted by Centennial in its current policy exceeds that of Perry and undercuts Centennial's contention that it has granted access only to those groups compatible with the school's educational mission.
 
 
 54
 While it stresses the need for religious and political neutrality, Centennial has opened its evening program to religious discussion and has granted access to politically active groups, such as neighborhood associations, labor unions and civic organizations such as the Rotary. Centennial has also opened its doors to dramatic and musical performances by commercial profit-making ventures. These performances are not required to relate to school or civic purposes. Civic organizations, which have taken stands on politically divisive issues, are also permitted to meet at the high school. The definition of the groups falling within the "educational mission of the school" is so vague that Centennial has virtually unlimited discretion in deciding which groups qualify and which do not. The term "civic" can be stretched or contracted to fit whatever the school district decides. The Court in Mergens outlined the problems associated with definitional overbreadth in the context of the Equal Access Act. We believe that the Court's conclusions, although confined to the Act, bear on the issue raised here:
 
 
 55
 Allowing ... a broad interpretation of 'curriculum-related' would make the [Act] meaningless. A school's administration could simply declare that it maintains a closed forum and choose which clubs it wanted to allow by tying the purposes of those clubs to some broadly defined educational goal. At the same time the administration could arbitrarily deny access to school facilities to any unfavored student club on the basis of its speech content.
 
 
 56
 Mergens, --- U.S. at ----, 110 S.Ct. at 2369 (quoting Mergens v. Board of Education, 867 F.2d 1076, 1078 (8th Cir.1989)). If the concept of a designated open forum is to retain any vitality whatever, the definition of the standards for inclusion and exclusion must be unambiguous and definite. The clear category of groups or clear category of subject matter required in a closed forum is absent here, violating the mandate of Perry and the reasoning in Mergens. While it disavows an intent to create an open forum Centennial has, in reality, opened its doors to those groups substantially outside what is commonly thought of as the educational mission of the school and has gerrymandered Student Venture out of Centennial facilities solely on the basis of the religious content of its program. "A public secondary school cannot simply declare that it maintains a closed forum and then discriminate against a particular ... group on the basis of the content of the speech of that group." Id.
 
 
 57
 While the policy contains a permission procedure which might suggest that gerrymandering has not occurred and that substantive content-screening takes place, the record is devoid of evidence showing that any group other than Student Venture has ever been denied access to school facilities. The district court noted the lack of a clear standard for granting or denying access when it wrote:
 
 
 58
 Here, defendant has opened the school facilities for general use by community groups that have the widest definitional range in its stated policy and, indeed, by concluding the list of eligible groups in their priority of use sequence by using the term "others," it can be presumed that there is virtually no limit on the groups that could apply for use of the buildings, subject, of course, to standards having to do with the protection and the security of persons, property, and the preservation of public resources committed to the school district. The school facilities here, subject only to the limitations of hours, administrative requirements of filing an application and paying the fees and costs, and conforming to the general standards regarding use that would not cause injury or damage to persons or property, though definitionally "limited," are for all intents and purposes a public forum from the vantage point of the protection of first amendment rights of free speech and association.
 
 
 59
 Gregoire, 674 F.Supp. at 177. The district court's conclusions were unaffected by the mid-litigation policy revision:
 
 
 60
 Although Centennial claims in its papers before this court that its 'new forum' is no longer a forum open to the general public, a reading of the new policy demonstrates that Centennial has, despite its declared intention, adopted as its new policy another open public forum, as that term has meaning in the constitutional sense.
 
 
 61
 Gregoire, 701 F.Supp. at 106.
 
 
 62
 In reaching this conclusion, the district court relied, in part, on the reasoning of the Supreme Court in Widmar. There the Court ruled that where the University of Missouri at Kansas City had officially recognized over 100 student groups and had given them access to university facilities, it had created a designated public forum. The university could not, therefore, exclude a student religious organization without a showing that the exclusion was necessary to serve a compelling state interest and narrowly drawn to achieve that end.
 
 
 63
 Centennial argues that Widmar does not control here. First, Centennial contends that where the University in Widmar intended to create an open forum but believed that it was constitutionally required to exclude religious groups, Centennial never intended to create an open forum but instead sought to limit access in accordance with the particular function of the secondary school.
 
 
 64
 Throughout the course of this litigation Centennial has refined and narrowed its position, arguing that despite the breadth of access granted, it has consistently evaluated each applicant against a definable standard relating to the function and mission of the school. Centennial's distilled position is that the critical factor separating Centennial from other users is not religion per se. The exclusion is based, not on the religious nature of Student Venture's speech, but on the element of conversion and the attempt to influence students inherent in the Student Venture program. Centennial asserts that it is this conversion element that sets Student Venture's speech apart from the wide spectrum of other speech permitted at William Tennent High School; its message alone is directed to students and is said to have this conversion component. Expressive activity by other groups is limited to the members of those adult groups or classes and, therefore, has no tendency to influence high school students toward a particular point of view. Centennial argues that it grants access to most groups because most groups do not have a conversion message. Limiting access to those groups not engaging in conversion speech, Centennial contends, is especially important in the secondary school where a conversion message is likely to undermine the school's interest in neutrality and to have an undue influence on impressionable youth.
 
 
 65
 Centennial argues that when its access policy and practice are viewed in light of this narrow criterion for exclusion, the wide access granted to other groups does not undermine its position that it maintains a closed forum with access tied to the purpose and mission of the school. The mission of the school in this view is one of preserving an image of neutrality vis-a-vis impressionable students and concerned parents. While this argument has a ring of logic, the facts of this case just do not support it.
 
 
 66
 When we view the school's access policy and practice in terms of this now narrowly defined criterion of exclusion, we note that, consistent with its definition of the school's mission, Centennial has supported religious speech in a number of contexts. Religion may be the theme of dramatic or musical productions, so long as these productions are not sponsored by a non-profit or charitable organization. Most critical to our evaluation of Centennial's purported reasons for excluding Student Venture is the fact that Centennial has also created an open forum for religious discussion in its evening classes and in the afternoon student activity period to which outsiders may be invited. Presumably, Andre Kole could come to the student open forum and present exactly the same program as that which is the subject of this litigation. What a student may not hear in the auditorium on a Saturday evening he may, consistent with Centennial's policy, hear in a school classroom with school staff present, immediately after classes. It is illogical to suggest that religious speech which is consistent with the mission and purpose of the school in the afternoon must be excluded as inconsistent when it takes place on a Saturday evening in the school auditorium.[6]
 
 
 67
 We note, too, that Centennial's policy does not support its contention that it has evaluated or made an effort to evaluate access requests in accordance with the newly articulated conversion criterion. By the terms of the policy, rental of school facilities is closed to all religious groups, regardless of the lack of a conversion message. Unlike neighborhood associations, civic groups, and labor unions, members of religious groups are denied the right to use school facilities to speak and meet with each other.[7] As we have noted, the policy explicitly prohibits, with certain notable exceptions, non-profit and charitable organizations from renting its facilities.[8] This policy provision thus reaches not only potentially divisive speech to students which might be said to impair the neutrality interest of the school, but also excludes speech to students or other audiences which does not contain a conversion element and may be highly relevant to the school's education program.
 
 B.
 
 68
 Despite the imprecise drafting and application of its policy, and the fact that outsiders may, consistent with policy, present information similar to that conveyed by Student Venture in after school activity periods, Centennial argues that we are precluded from finding that it intended to create a designated open forum because the facilities in question are those of a public secondary school.
 
 
 69
 We recognize that the nature of the property and its compatibility with expressive activity are factors bearing on intent and that many public forum decisions have been grounded on these factors. There can be no real dispute, however, that the school facilities, after-hours, are compatible with expressive activity. A vast amount of expressive activity takes place now and has taken place in these facilities. The question becomes, then, whether there is something about the nature of the public secondary school which invalidates the district court's forum conclusions.
 
 
 70
 Centennial argues that the district court erred in extending Widmar to the secondary school setting. Widmar, it contends, has no application outside the university. In support of this proposition, Centennial cites our decision in Student Coalition for Peace v. Lower Merion School Dist., 776 F.2d 431 (3d Cir.1985).
 
 
 71
 In Student Coalition for Peace, the school board refused to allow a group of students to hold a peace fair on one of the school's athletic fields although the board had allowed non-school groups to conduct Memorial Day and athletic events on the field. We found that no public forum had been created by these limited other uses and that the board's desire to avoid the appearance of political favoritism was valid justification for limiting speech in this non-public forum. We grounded our decision on the facts of that case and found that the school board had not opened the property to public use so as to create a limited forum. We did not take the position that a public forum could not be created in a secondary school, i.e., that a Widmar open forum could not exist in a secondary school facility. Instead, we undertook the same forum analysis set forth here and, on different facts, with much more limited access, found that no public forum had been created.[9]
 
 
 72
 While public secondary schools in general may not possess many of the characteristics of a traditional public forum, the William Tennent High School does, as a result of school board action, resemble a university in some critical ways. Indeed, Centennial has freely granted its students access to school facilities co-extensive with those available to university students in Widmar. Thus we find nothing about this secondary school per se to invalidate the method of forum analysis employed in Widmar. In light of the Supreme Court's decision in Mergens it is now clear that a secondary school may, by its acts, create a public forum implicating the same constitutional rules set forth in Widmar.[10]
 
 V.
 
 73
 On the facts of this case, we find that the Centennial school district has created a designated open forum for speech such as that presented by Student Venture. We arrive at this conclusion having examined each of the factors integral to public forum analysis as identified in Perry, Cornelius and Widmar.
 
 
 74
 We do not believe that these cases require that we give conclusive effect to Centennial's contention that it maintains a closed forum. We cannot conclude that, because there is new exclusionary language in the wording of the revised policy, we are precluded from finding that the school district has created a designated open forum. If this is, indeed, what Cornelius requires, there is no longer a place in the law for the concept of the designated open forum; the government may, upon the most tenuous and internally inconsistent grounds, pick and choose those to whom it grants access for purposes of expressive activity simply by framing its access policy to carve out even minute slices of speech which, for one reason or another, it finds objectionable. We do not read either Perry or Cornelius as sounding the death knell for the designated open forum.
 
 
 75
 When Centennial originally sought a preliminary injunction seeking to bar Student Venture from use of its high school auditorium, it had in force a comprehensive facilities use policy which imposed a ban on the use of school facilities for religious purposes.[11] Despite this limiting language in the policy, the district court found that Centennial had created a designated open forum. As the dissent points out, "as a result of its finding of indiscriminate permission to use school facilities, the district court properly concluded that Centennial could not exclude Student Venture from using the auditorium ... in the absence of a compelling state interest." (Emphasis added.)
 
 
 76
 Centennial's mid-litigation revision of the facilities use policy in practical terms changed nothing. If it was correct for the district court to find that the grant of indiscriminate access to school facilities created an open forum under the old policy, it is inconceivable that the virtually identical, arguably expanded, access granted under the new policy would not lead to the same result. Centennial's changed wording and strategic description of existing groups do not hold for us the magic which, in the view of the dissent, transforms the identical practice from unacceptable to acceptable.
 
 
 77
 We have weighed Centennial's overt statements of intent, its policy, its practice of granting access pursuant to that policy, its consistency in applying the standards purportedly embodied in the policy, the reasoning underlying its grant or denial of access and the nature of this particular secondary school and its compatibility with the speech proposed here. On the basis of these factors, we conclude that, as to speech of the type embodied in the Kole performance, Centennial has not created a closed forum in the constitutional sense. The forum created is open and encompasses speech of the same character as that permitted in the afternoon student open forum periods.
 
 
 78
 While we do not take issue with the idea that speech which is appropriate and permissible in some public school contexts may be appropriately excluded from other contexts, we do believe that Centennial's assumptions in opening its limited afternoon student forum and in permitting religious speech in other contexts bear on our analysis here. It is not the existence of religious discussion in some contexts per se which leads us to our holding. It is, instead, that the assumptions underlying the tolerance of religious speech in other contexts, particularly in the afternoon student forum, undercut the rationale advanced by Centennial for excluding religious speech from the high school auditorium during non-school hours.
 
 
 79
 In concluding that Centennial has not maintained a closed forum, we emphasize that the basis of our holding is narrow. Centennial must be consistent in granting facilities access: where it permits potentially divisive or conversion-oriented speech by outsiders to a student audience in school facilities in the afternoon and determines what this speech is consistent with the function and mission of the school system, it cannot, on maturity or "mission" grounds, exclude the same type of speech directed to the same audience from its facilities in the evening. Where it identifies student-directed conversion speech as its criterion for exclusion, it cannot reasonably allow some members of some groups to meet with each other and deny access to others whose speech does not implicate this conversion element.
 
 VI.
 
 80
 As we have noted, content-based regulation of speech in an open forum must satisfy the strict scrutiny test. Cornelius, 473 U.S. at 802-03, 105 S.Ct. at 3448-50. An exclusion must be necessary to serve a compelling state interest and be narrowly drawn to achieve that end. Centennial claims that its exclusion of Student Venture withstands strict scrutiny analysis in that the exclusion is necessary to comply with the establishment clause of the United States Constitution. In making this argument, Centennial attempts to distinguish Widmar.
 
 
 81
 In considering whether a student religious group could be granted access to university facilities without violating the establishment clause, the Supreme Court in Widmar referred to the University of Missouri campus as "a forum generally open to the public," 454 U.S. at 268, 102 S.Ct. at 273. It held that the University could open its doors to religious student groups without offending the establishment clause, concluding that university students were young adults and were "less impressionable than younger students and should be able to appreciate that the University's policy is one of neutrality toward religion." Id. at 274 n. 14, 102 S.Ct. at 276 n. 14.
 
 
 82
 Centennial here again argues that Widmar has no automatic application in the secondary school setting and that an action innocent at the university level may violate the establishment clause in the lower grades. Centennial sets forth in its brief that Widmar principles should be confined to the university setting, relying primarily on an asserted impressionability of the "children in the audience" at the Kole performance for whom the magic act is a "lure." By upholding the constitutionality of the Equal Access Act which extended the principles of Widmar to secondary school student groups, the Supreme Court in Mergens has determined that the establishment clause does not prevent secondary school groups from meeting on school property immediately following afternoon classes. We must now determine whether the establishment clause concerns are somehow different where a religious organization is permitted to rent a secondary school auditorium during non-school, weekend, hours.
 
 
 83
 Establishment clause questions are governed by the three-prong test of Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). To pass constitutional muster, the governmental policy "must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion ...; finally, the policy must not foster excessive government entanglement with religion." Id. at 612-613, 91 S.Ct. at 2111-12. The Lemon test may be applied more or less strictly depending upon the educational setting in which the speech arises. Trial courts must be "particularly vigilant in monitoring compliance with the Establishment Clause in elementary and secondary schools." Edwards v. Aguillard, 482 U.S. 578, 583-84, 107 S.Ct. 2573, 2576-77, 96 L.Ed.2d 510 (1987). The emphasis in Aguillard parallels that in Widmar: younger students are impressionable, schools play an inculcation role and families entrust public schools with the education of their children, expecting schools to maintain religious neutrality.
 
 
 84
 We must determine whether, on the particular facts before us, Widmar would not control and that granting Student Venture access to the school auditorium would violate the establishment clause. We turn, then, to the Lemon test.
 
 
 85
 It is undisputed that in establishing its facility use policy and in granting access to a wide spectrum of outside groups, Centennial had no religious objective or nonsecular purpose. The first prong of the Lemon test is satisfied.
 
 
 86
 We next consider the second prong of the Lemon test, i.e., whether allowing access to Student Venture would have the effect of advancing religion. It is on this prong that Centennial rests its establishment clause defense. Centennial contends that its interest in maintaining a position of neutrality vis-a-vis its students and their parents would be fatally compromised by allowing Student Venture access to the high school auditorium; its students are too impressionable to understand that allowing Student Venture to rent school facilities does not imply Centennial's endorsement of the message presented. "[I]t is crucial that a government practice not have the effect of communicating a message of government endorsement or disapproval of religion." Lynch v. Donnelly, 465 U.S. 668, 692, 104 S.Ct. 1355, 1369, 79 L.Ed.2d 604 (1984) (O'Connor, J., concurring). We believe that Widmar and Mergens are relevant in evaluating Centennial's establishment clause claim.
 
 
 87
 We note first Widmar's conclusion that, in the university setting, granting a religious organization permission to use school facilities does not imply an endorsement of religious goals. In reaching this conclusion, the Court stressed the free access given to a broad spectrum of groups. This was seen as an "important index of secular effect." 454 U.S. at 274, 102 S.Ct. at 277. In Widmar, the second prong of the Lemon test was satisfied.
 
 
 88
 We believe that it is satisfied here as well. Where groups seeking access to the high school facilities are treated equally, the message communicated "is one of neutrality rather than endorsement; if a State refused to let religious groups use facilities open to others, then it would demonstrate not neutrality but hostility toward religion." Mergens, --- U.S. at ----, 110 S.Ct. at 2371.
 
 
 89
 By voluntarily creating a limited open forum for students in school facilities, immediately following school hours, with school monitors present, and allowing these same students to invite outsiders to be present, Centennial has made a decisive judgment concerning the maturity of its high school and junior high school students and their ability to understand that granting access to a group does not imply endorsement of the message presented.[12] Having made this maturity judgment about its students in a context where there are arguably strong indicia of school sponsorship, Centennial cannot now be heard to assert a lack of student maturity where the connection between the school and the event is far more attenuated. Student Venture's proposed use of the auditorium is occasional only, is directed to high school students, and would take place during the evening hours.[13] In this context, we believe that Justice O'Connor's language in the plurality portion of the Mergens opinion is apposite:
 
 
 90
 [T]here is little if any risk of official state endorsement or coercion where no formal classroom activities are involved and no school officials actively participate. Moreover, petitioner's fear of a mistaken inference of endorsement is largely self-imposed, because the school itself has control over any impressions it gives its students. To the extent that a school makes clear that its [allowing use of its facilities] is not an endorsement of the views of the ... participants, students will reasonably understand that the school's [granting access] evinces neutrality toward, rather than endorsement of, religious speech.
 
 
 91
 --- U.S. at ----, 110 S.Ct. at 2372 (citation omitted).
 
 
 92
 We also adopt the Supreme Court's analysis in Widmar in considering the third prong of the Lemon test--whether granting access to Student Venture will promote excessive entanglement with religion. "The usual setting for an entanglement clause violation is when a state official, in order to avoid giving state aid to religion, must make determinations as to what activity or material is religious in nature, and what is secular and therefore permissible." Bender, 741 F.2d at 555. A content-neutral access policy eliminates the need for these distinctions. As Widmar points out, prohibiting religious meetings may actually exacerbate entanglement. The Court's comments concerning the university setting are instructive:
 
 
 93
 [t]he University would risk greater "entanglement" by attempting to enforce its exclusion of "religious worship" and "religious speech." Initially, the University would need to determine which words and activities fall within "religious worship and religious teaching." This alone could prove an impossible task in an age where many and various beliefs meet the constitutional definition of religion. There would also be a continuing need to monitor group meetings to ensure compliance with the rule.
 
 
 94
 Widmar, 454 U.S. at 272 n. 11, 102 S.Ct. at 275 n. 11 (citations omitted). We find nothing in the facts of this case weighing against the application of Widmar on this issue and thus conclude that there is no risk of excessive entanglement with religion in Centennial's applying a content-neutral approach to facilities access in the evening hours. The third prong of the Lemon test, then, is satisfied.
 
 
 95
 Having undertaken the strict scrutiny analysis required by the facts of this case, we conclude that Centennial's facility use policy excluding Student Venture from meeting and from renting school space is not narrowly drawn to achieve a compelling state interest. So long as Centennial maintains a limited student open forum to which outsiders may be invited, it expresses a judgment concerning its students' ability to distinguish neutral access from state sponsorship of the view expressed. Centennial cannot, therefore, rely on the impressionability of these same students as the basis for content-based exclusions from its facilities in the evening hours or as the basis for an establishment clause defense. Nor can Centennial reasonably argue that the Student Venture program is potentially divisive and inconsistent with the educational mission of the school where it would welcome the same program directed to the same audience in the afternoon setting.[14] We will, therefore, affirm the district court's grant of a permanent injunction in the appeal of Centennial School District.
 
 VII.
 
 96
 The cross-appeal by Student Venture requires that we advance one step beyond where the district court stopped. In drawing a line between religious discussion and religious worship, concluding that discussion is within the parameters of the permanent injunction and worship without, we believe that the district court erred. As the majority in Widmar makes clear, both religious discussion and worship constitute speech protected by the first amendment. (Indeed, at oral argument, counsel for Centennial conceded that a distinction between religious speech and religious worship is untenable in an open forum and stated that Centennial did not stand on that distinction.) Both types of activity are permitted in the student open forum and we have been presented with no principled argument for excluding the same types of speech from school facilities in the evening. Attempting to draw a line between religious discussion and worship would only exacerbate establishment clause concerns, requiring Centennial to entangle itself in what would almost certainly be complex content-determinations. We believe that the neutrality interest of the school is best preserved where the government is content-neutral. Because the permanent injunction granted by the district court was too narrow in scope, we will remand this matter for entry of an injunction enlarged to conform to this opinion.
 
 VIII.
 
 97
 Finally, we address Student Venture's contention that the district court erred in failing to consider Centennial's flat ban on distribution of religious literature:
 
 
 98
 d. The sale or distribution of Bibles, testaments, scriptures or religious literature is prohibited.
 
 
 99
 We begin with the legal principle that the right of free speech encompasses the right to distribute literature. Heffron v. International Society for Krishna Consciousness, 452 U.S. 640, 647, 101 S.Ct. 2559, 2563, 69 L.Ed.2d 298 (1981); Gillette v. U.S., 401 U.S. 437, 462, 91 S.Ct. 828, 842, 28 L.Ed.2d 168 (1971); Martin v. City of Struthers, 319 U.S. 141, 63 S.Ct. 862, 87 L.Ed. 1313 (1943); Murdock v. Pennsylvania, 319 U.S. 105, 111-112, 63 S.Ct. 870, 874-875, 87 L.Ed. 1292 (1943).
 
 
 100
 Having noted the explicit creation of a student limited open forum in the afternoon, we recognize that, consistent with our analysis of the claims set forth above, any content-based restriction on speech in this forum must be shown to be narrowly drawn to achieve a compelling state interest. Centennial has asserted no compelling interest supporting its ban on distribution of religious material and, therefore, in the afternoon student forum, the ban is unconstitutional. This conclusion does not affect Centennial's right to "enforce regulations of time, place and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." Perry, 460 U.S. at 45, 103 S.Ct. at 955.
 
 
 101
 The argument advanced by Centennial in support of its ban on religious material in contexts outside the student open forum context hinges again on its argument that it maintains a closed forum and, in essence, may ban whatever it deems necessary for protection of impressionable children.[15] We recognize the difficult role assigned to the school in achieving a balance between protecting its students and allowing them a measure of freedom necessary to intellectual development. While we can envision circumstances in which the school might have a compelling interest in shielding its students from indecent or inflammatory speech, we believe that, in the context of religious speech, Centennial's prior judgments concerning its students' maturity tip the balance away from the need for protection. We have concluded that Centennial has created an open forum in the William Tennent High School facilities and therefore cannot uphold the flat ban on all distribution of religious materials.
 
 
 102
 While Centennial has not raised an establishment clause defense in this context, we would, again through analogy to Widmar, find no violation of the Lemon three prong test.[16] With respect to the distribution issue, then, we find that the permanent injunction issued by the district court was too narrow.
 
 IX.
 
 103
 Having concluded that an open forum exists in the facilities of the William Tennent high school, we will affirm the district court's grant of a permanent injunction but will remand this matter in order that the district court may issue a revised injunction drafted, in conformity with this opinion, to include religious worship and distribution of religious materials.
 
 STAPLETON, Circuit Judge, dissenting:
 
 104
 I respectfully dissent. Based on Cornelius v. NAACP Legal Defense and Educational Fund, Inc., 473 U.S. 788, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985), this court should conclude that Centennial School District ("Centennial") has established a "nonpublic forum" rather than a "designated public forum," and that the lowered scrutiny prescribed for testing exclusions from such fora must therefore be applied. Applying this level of scrutiny, I am satisfied that Student Venture's exclusion from the school auditorium of the William Tennent High School is "reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." Perry Education Association v. Perry Local Educators' Association, 460 U.S. 37, 46, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983). However, I believe Centennial's blanket prohibitions on religious worship and distribution of religious literature present issues that it is premature for us to address. Accordingly, I would reverse the judgment of the district court and remand with instructions to address the bans on worship and distribution of religious literature, and to enter judgment for the defendants with regard to the remainder of the Centennial Facility Use Policy.A.
 
 
 105
 When asked to enter a preliminary injunction, the district court found that Centennial, subject to limitations of hours, administrative requirements, and so forth, granted permission to anyone who wished to use school facilities. Gregoire v. Centennial School District, 674 F.Supp. 172, 177 (E.D.Pa.1987). This factual finding was based on evidence showing the uses permitted in the past, not the rather sketchy written policy on facility use then in existence. As a result of its finding of indiscriminate permission to use school facilities, the district court properly concluded that Centennial could not exclude Student Venture from using the auditorium for Andre Kole's performance in the absence of a compelling state interest. Id. at 179-80. It then concluded that permitting Kole's performance would not result in an establishment clause violation and that Centennial, accordingly, had no compelling interest in avoiding such a violation. Id. at 177-78. A preliminary injunction issued and Kole's performance went forward.
 
 
 106
 On March 8, 1988, Centennial adopted new detailed regulations governing the use of school facilities. These regulations remained in effect nine months later when the district court entered its permanent injunction and issued a second opinion. In that opinion, the district court did not identify any instance after March 8, 1988 in which the new regulations were not followed and Student Venture has referred us to no such instance during this appeal. While the district court was not satisfied that further constitutional violations would not occur, this concern was based on its view that the new regulations themselves violated the first amendment rights of Student Venture. In its words, "a reading of the new policy demonstrates that Centennial has, despite its declared intention, adopted as its new policy another open public forum, as that term has meaning in the constitutional sense." Gregoire v. Centennial School District, 701 F.Supp. 103, 106 (E.D.Pa.1988). As a result of this conclusion and because nothing in the record suggests that Centennial has not followed its new written policy consistently and in good faith, the threshold issue before us, as I see it, is whether the new regulations create an open public forum by designation or a nonpublic forum. I conclude that they create a nonpublic forum.
 
 B.
 
 107
 The first step in public forum analysis requires that we identify the relevant "forum." This is particularly important in this case because there are a number of different "fora" maintained in the same physical facilities. In the Cornelius case, the defendants contended that the relevant forum was the federal workplace, while the plaintiffs contended that it was the particular government program in which the plaintiff wished to participate, i.e., the Combined Federal Campaign (CFC), a charity drive aimed at federal employees. The Supreme Court held that the CFC was the relevant forum for first amendment analysis. Cornelius teaches that the forum "must be defined in terms of the access sought by the speaker" and that "the particular channel of communications [the speaker desires to use] constitutes the forum." 473 U.S. at 800-801, 105 S.Ct. at 3447-3448.
 
 
 108
 The existence of more than one forum at William Tennent High School is most readily seen by contrasting the forum to which Student Venture seeks access with a far more important forum from Centennial's point of view, the classroom forum created day in and day out in order to carry out the primary mission of the school. The purpose of this forum is to educate the student body with respect to the subjects covered by the school's curriculum. Accordingly, access to this forum is limited to students and faculty and to the school's curriculum. See generally Laycock, Equal Access and Moments of Silence: The Equal Status of Religious Speech by Private Speakers, 81 Nw U.L.Rev. 1, 46-51 (1986) (discussing nature of school as forum). Student Venture does not seek access to this forum and concededly is not entitled to such access.
 
 
 109
 In addition to the regular daytime classroom forum, Centennial sponsors an Adult Evening School. As its name indicates, the purpose of this forum is to provide continuing education for adults from the school community. In addition to classes for foreign-born residents and other adults who wish to improve their basic English skills and prepare for the high school equivalency diploma exam, this program permits adult discussion groups to rent classroom space. In the words of the regulations, "[adults] seeking an 'open forum' for the free expression of ideas may make special arrangements to rent classroom space to teach such ideas in an objective manner through the Evening School Director."
 
 
 110
 The third forum that uses the school district facilities is denominated by the regulations as the "limited open student forum:"
 
 
 111
 A "limited open student forum" (meeting) may be requested by any secondary student or students enrolled in the Centennial School District who desire(s) to voluntarily initiate a meeting (to be held in an assigned area at no cost to the School District) in order to peacefully and with appropriate decorum discuss religious, political, philosophical or other topics which are not related to the curriculum, and wherein the School District or its employees will not be involved in any way in sponsorship of such meeting or discussion.
 
 
 112
 In recognition of the fact that students have and should have interests in matters beyond the school's curriculum, a forty-five minute afternoon period has been set aside so that any students who are so inclined may voluntarily gather to discuss extra-curricular topics among themselves. Religion is included as such a topic in response to the Equal Access Act, 20 U.S.C. Sec. 4071, which prohibits any school that makes facilities available to noncurriculum related student groups from excluding any group "on the basis of the religious, political, philosophical, or other content of the speech at such meetings." 20 U.S.C. Sec. 4071(a). Contrary to the impression left by the court's opinion, the regulations provide that (1) such meetings may only be initiated by students, (2) the direction and control of the forum and content of the meetings must remain with the students, and (3) no outside group or person may have access to such a meeting without a written invitation from the students involved and "advance specific School Board approval which must be sought 30 days in advance." Even when such permission is given, the outside group or person may not regularly attend such meetings and may not control or conduct such a meeting.
 
 
 113
 The regular daytime classroom program, the Adult Evening School program, and the limited open student forum are each separate programs created by Centennial with specific and distinct objectives. In addition to these programs, other groups are permitted to use school facilities for the group's own purposes, in some cases in return for the reimbursement of the direct cost to Centennial and in others upon the payment of a rental fee that exceeds those costs. It is this facilities rental program that is of primary relevance in this case. The groups permitted to participate in this program are specifically enumerated in the regulations. As reflected in the portion of the regulations reprinted in the appendix to this opinion, these groups fall into several categories. First, there are school affiliated organizations such as the parent-teacher associations, staff organizations, and booster organizations. Second, there are groups unaffiliated with the school whose members are residents of Centennial and who need space to pursue their own particular interests, e.g., "scouting organizations," "resident neighborhood associations organized for the purpose of discussion of neighborhood affairs," "resident music, artistic, and player associations," and "Resident Service organizations: Rotary, Kiwanis, Lions, Jr. Chamber of Commerce and like non-sectarian service organizations." Permitted groups must be open to "all otherwise qualified residents regardless of race, ethnic background, and/or religion." Groups in these first two categories are entitled to utilize the facilities in return for reimbursement of Centennial's direct costs.
 
 
 114
 Three additional classifications of users are permitted access but only with advance payment of a significant rental fee:The following groups may make application for use of auditoriums, subject to the priorities of school use, with the understanding that established fees are above District cost and that all projected fees must be paid in advance:
 
 
 115
 1. Community based employee associations and labor unions (limited to members only) for meetings only.
 
 
 116
 2. Commercial profit making ventures which charge admission or sell tickets for the staging of plays and/or musical performances suitable for general audiences.
 
 
 117
 3. College/university course offerings/usage (classroom use only ).
 
 
 118
 As we shall see, the existence of fora other than the one to which the plaintiffs seek access may be relevant to the analysis in a case of this kind. The existence and character of such fora, however, do not play the central role accorded them by the district court and this court's opinion.[1] The fact that a speaker or a topic is recognized as appropriate for one forum does not mean that speaker or topic must be recognized as appropriate in another. Surely, the fact that religion is recognized as an appropriate topic for students to discuss in the "limited open student forum" or that transcendental meditation is taught to adults in the Adult Evening School does not mean that evangelical discourse must be permitted in the classroom or study hall.
 
 C.
 
 119
 The district court's analysis and that of this court is based on the assumption that when a public entity permits an increasing number of different groups to use its facilities there comes a point at which it has created a public forum by dedication and can no longer exclude anyone absent a compelling state interest. As I read Cornelius and its progeny, however, a public entity is entitled to define the limits of any forum it creates so long as there is a basis for excluding the excluded speakers that is reasonable in light of the purpose of the forum and so long as it does not engage in viewpoint discrimination. Accordingly, so long as a school board makes its intent clear in written rules that are consistently followed, it may have a facilities policy, like that of this school district, that grants liberal access to school facilities and still excludes some potential users, without being required to articulate a compelling state interest mandating exclusion.[2]
 
 
 120
 In Cornelius, the Supreme Court made intent the touchstone for determining whether a government entity has created a "designated public forum," as opposed to a "non-public forum." It mentioned several kinds of evidence to which a court might look to ascertain the intent of the government, but the government's intent in creating the forum was the ultimate and determinative issue to be ascertained:
 
 
 121
 The government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a non-traditional forum for public discourse. Accordingly, the Court has looked to the policy and practice of the government to ascertain whether it intended to designate a place not traditionally open to assembly and debate as a public forum. The Court has also examined the nature of the property and its compatibility with expressive activity to discern the government's intent....
 
 
 122
 .... We will not find that a public forum has been created in the face of clear evidence of a contrary intent.
 
 
 123
 473 U.S. at 802-803, 105 S.Ct. at 3448-3450 (citations omitted).
 
 
 124
 In Cornelius the challenged executive order permitted participation in the CFC by voluntary, charitable, health and welfare agencies that provide services directly to individuals but specifically excluded agencies "that seek to influence the outcomes of elections or the determination of public policy through political activity or advocacy, lobbying, or litigation on behalf of parties other than themselves." The NAACP Legal Defense Fund was denied participation in the CFC based on this exclusion. The Supreme Court found that the government had created and maintained the CFC with the intent of providing selective access and concluded that "such selective access, unsupported by evidence of a purposeful designation for public use, does not create a public forum." 473 U.S. at 805, 105 S.Ct. at 3450. Accordingly, despite the fact that the NAACP was excluded on the basis of its core first amendment expressions, the Supreme Court declined to apply "compelling state interest" scrutiny. It prescribed a less stringent test when it summarized its holding:
 
 
 125
 Control over access to a non-public forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral....
 
 
 126
 473 U.S. at 806, 105 S.Ct. at 3451; accord Perry, 460 U.S. at 46, 103 S.Ct. at 955.
 
 
 127
 This Circuit acted consistently with my understanding of Cornelius in Student Coalition for Peace v. Lower Merion School Dist., 776 F.2d 431, 436-47 (3d Cir.1985). After quoting the foregoing portion of Cornelius, we held that a school facility was not a designated public forum because the School Board did not grant permission to use the field in question "as a matter of course" but rather intentionally exercised discretion as to whether a non-school sponsored organization would be permitted to use the facility:
 
 
 128
 We do not think that the evidence in this case shows an intent by appellees [i.e., School Board members] to create a public forum at Arnold Field. The Board's policy requires each nonschool sponsored organization, such as SCP, to obtain permission to use the Field.... We agree with the district court that SCP has not met its burden of showing that such permission was in fact granted as a matter of course. Thus, neither the written policy nor the actual practice of the appellees manifests an intent to designate Arnold Field as a public forum.
 
 
 129
 Id. at 436. Thus, the dispositive fact in Student Coalition for Peace was the absence of an affirmative intent on the part of the school board to open the athletic field to all comers. Similarly, the evidence in this case demonstrates that Centennial, after March 8, 1988, lacked any intent to open the auditorium or other school facilities to all comers. In the absence of any evidence of non-conforming conduct, the detailed regulations adopted on that date alone are sufficient to establish that fact.[3]
 
 
 130
 After March 8, 1988, Centennial's position was quite similar to that of the City in Lehman v. City of Shaker Heights, 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974). There the City operated a rapid transit system and sold advertising space inside its cars. Its policy called for it to accept advertising from a wide variety of sources, e.g., "from cigarette companies, banks, savings and loan associations, liquor companies, retail and service establishments, churches and civil and public service oriented groups." Id. at 300, 94 S.Ct. at 2716. It refused, however, to accept a political advertisement submitted by the plaintiff. The Supreme Court concluded that "a city transit system has discretion to develop and make reasonable choices concerning the type of advertising that may be displayed in its vehicles," 418 U.S. at 303, 94 S.Ct. at 2717, and that there had been no violation of the candidate's rights under the first amendment. Lehman has since been cited as a case involving a non-public forum. E.g., Cornelius, 473 U.S. at 809, 105 S.Ct. at 3452; Perry, 460 U.S. at 49 n. 9, 103 S.Ct. at 957 n. 9. The City's policy in Lehman permitted as many different types of speech as the school district has in this case; nevertheless, the court upheld the content-based exclusion on a finding that it was reasonable in the context of the forum created. See also Perry, 460 U.S. at 48, 103 S.Ct. at 956 (finding nonpublic forum where access had been granted to "outside organizations such as the YMCA, Cub Scouts, and other civic and church organizations.").
 
 
 131
 In short, based primarily on Cornelius, Lehman, and Student Coalition for Peace, I conclude that if a school district's policy is clear and consistent it may prohibit religious speakers from a forum and welcome all other types of speakers without creating a public forum.
 
 D.
 
 132
 Concluding that Student Venture seeks access to a nonpublic forum does not, of course, end the analysis. When a public entity defines a nonpublic forum as a part of its program, and is challenged by someone who is excluded by that definition, the exclusion can be sustained only if it is reasonable in light of the purpose served by the forum and does not discriminate on the basis of the viewpoint of the speaker, as contrasted with the subject matter of his or her speech. Accordingly, I turn to a comparison of Student Venture with those groups who are permitted access to the relevant forum.
 
 
 133
 There is no difficulty in distinguishing the use of school district facilities by school affiliated organizations who, unlike Student Venture, share a common objective with Centennial, the success of the school program. In a somewhat similar vein, a common dedication to education supports Centennial's decision to allow use of school facilities for college or university course offerings. I also believe it clear that Centennial has a rational basis for distinguishing between the use of school facilities by Student Venture and their use by local special interest groups consisting of district residents whose families pay the tax bills that enable the school district to operate. While Student Venture has resident members, it is not an organization whose purpose is to serve the needs of residents of the school district. The same rational basis for distinguishing local special interest groups from Special Venture also justifies the distinction between Student Venture and "community based employee associations and labor unions (limited to members only)."
 
 
 134
 More extended discussion is required with respect to the school district's inclusion of outside profit making ventures that stage plays and musicals for general audiences and its exclusion of Student Venture's Andre Kole production. Student Venture is candid in acknowledging that it seeks access to a general audience from the school community, which will include parents and children of all ages, in order to solicit their allegience to a particular religious view. I understand Centennial to advance two distinct justifications for its attempt to exclude such proselytizing religious speech from the school auditorium. First, there is an establishment clause-related concern for the possibility that young children will mistakenly perceive a message that the government, through the school, endorses the religious speech that is presented to a general audience in the school auditorium. Second, Centennial cites its desire to assure parents that school grounds will be kept free of the potentially divisive effect of outside groups urging an audience including young children to affiliate with a particular religion or subdivision thereof.[4]
 
 
 135
 Centennial's concerns are very similar to the concerns held to justify the exclusion of the NAACP Defense Fund from the CPC in the Cornelius case. There the Supreme Court held that the government's desire to avoid the "appearance of favoritism" and to "avoid controversy" were sufficient to justify the exclusion from a non-public forum, even though "avoidance of controversy is not a valid ground for restricting speech in a public forum." 473 U.S. at 811, 105 S.Ct. at 3453. Of course, these concerns are far more compelling when public schools are involved. "In no activity of the State is it more vital to keep out divisive forces than in its schools." Edwards v. Aguillard, 482 U.S. 578, 107 S.Ct. 2573, 2578, 96 L.Ed.2d 510 (1987), (quoting McCollum v. Board of Educ., 333 U.S. 203, 231, 68 S.Ct. 461, 475, 92 L.Ed. 649 (1948) (Frankfurter, J., separate opinion).
 
 
 136
 I conclude that these same justifications are sufficient to support Centennial's policy in this case. It is not irrational for school board members to conclude that there would be a significant danger of communicating favoritism or endorsement if they permitted an outside religiously oriented organization access to a general audience from the school community for the purpose of soliciting converts. Nor is it irrational for school board members to conclude that permitting the auditorium to be used to attempt to convert members of a general audience from the school community to a particular religious viewpoint has a considerable potential for generating divisiveness.[5]
 
 
 137
 The court's opinion questions the sincerity of Centennial's justifications because the policy permits some religious speech and because it excludes some non-proselytizing religious speech. It is not clear to me that it is the place of the Court to question the sincerity of the rational basis tendered by a government defendant so long as it is not a pretext for viewpoint discrimination. When legislative and executive decisions are subjected to rational basis review, it is normally sufficient for the decisionmakers to identify a rational justification that they could have relied upon to support their decision. An historical fact inquiry into their subjective intent ordinarily is not required. See United States Railroad Retirement Bd. v. Fritz, 449 U.S. 166, 179, 101 S.Ct. 453, 461, 66 L.Ed.2d 368 (1980); Flemming v. Nestor, 363 U.S. 603, 612, 80 S.Ct. 1367, 1373, 4 L.Ed.2d 1435 (1960).
 
 
 138
 Moreover, I believe the court's logic is also flawed because it fails to acknowledge Centennial's reasons for treating the various fora differently. Participation in the Adult Evening School is by definition limited to adults, rather than to a general audience from the school community. This fact alone provides an explanation for Board's position that is entirely consistent with its good faith. In addition, in the absence of evidence or fact finding to the contrary, I read the reference to "teach[ing] in an objective manner" with the approval of the Evening School Director to contemplate courses which approach religious subject matter in a pedagogical manner. This, combined with the fact that such study groups must be small (since only classroom space is made available) and self-initiated by the participating adults could lead a rational board member to conclude that religious subject matter in the Adult Evening School holds far less potential for divisiveness or an appearance of favoritism than permitting Andre Kole to perform in the auditorium.
 
 
 139
 Nor does the admission of religious subject matter to the afternoon student forum cast doubt upon Centennial's motive in excluding Kole from the auditorium. Here also the participants are limited to relatively mature individuals, i.e. secondary school students. Here also the groups must be small and initiated by the participants. Finally, because of the Equal Access Act, Centennial was confronted with the choice of having a forum for extracurricular discussion with religious subject matter or not having a forum for extracurricular discussion at all. Given this choice, a rational school board member could opt for creating such a forum with religious subject matter and still believe it was not in the district's best interests to permit auditorium performances by outside nonprofit organizations.
 
 
 140
 It is true, as the court's opinion stresses, that the regulations governing the facility rental program do not refer specifically to proselytizing. Nevertheless, I believe Centennial's justifications support the distinction it has in fact drawn. The regulations permit music and theatrical productions staged by amateur groups consisting of school district residents and those staged by outside for profit organizations while they exclude such productions by outside nonprofit organizations. A rational school board could conclude that the likelihood of divisive speech or behavior that would give the appearance of favoritism on the school's part is substantially greater in the case of outside organizations whose activities are not motivated by profit than in the case of resident theatre groups or outside, for-profit productions. Outside nonprofit organizations seeking access to a general audience of strangers from the school community in most instances will either be proselytizing or soliciting financial support for their cause. While it is true that not all outside, nonprofit organizations would engage in activities of this kind if given permission to use the auditorium, the law does not require precise tailoring in this setting, only a rational basis for the distinction drawn; probabilities that favor the distinction are sufficient. I would further note that reliance on probabilities is particularly justified in a context like this where, as the court's opinion points out, there are substantial difficulties in drawing lines in advance in an attempt to isolate proselytizing conduct per se, and where exercising discretionary judgment on a case-by-case basis would endanger Centennial's desire to avoid any appearance of favoritism. Cf. Cinevision Corp. v. City of Burbank, 745 F.2d 560, 575 (9th Cir.1984) ("the more subjective the standard used, the more likely that the category will not meet the requirements of the First Amendment").
 
 
 141
 Finally, I turn to the issue of whether Centennial's regulations constitute, or are a pretext for, viewpoint discrimination. I do not understand the district court or this court to have found viewpoint discrimination. Moreover, I am not sure that Student Venture claims that Centennial is guilty of such discrimination. It does, however, stress that adult groups have been permitted to discuss yoga and transcendental meditation in the Evening School and that an outside for profit theatre group could presumably produce Godspell or Jesus Christ Superstar in the school auditorium. This emphasis occurs primarily in the context of an argument that the school facilities have been "opened up" to religious speech so that they are a public forum at least with respect to such speech, but there appears to be an additional implication that Student Venture's view of ultimate reality has been discriminated against.
 
 
 142
 When addressing any viewpoint discrimination issue, it is important to keep in mind the Supreme Court's distinction between subject matter discrimination and viewpoint discrimination. Cornelius makes clear that a public entity can exclude discourse on a particular topic from its forum so long as it has a rational basis for doing so. It may not, however, permit some viewpoints about a particular subject matter and exclude others without a compelling state interest. Accordingly, a school district may create a forum for a particular purpose and exclude all discourse in that forum concerning the nature of ultimate reality so long as it has a rational basis grounded in the purpose served by the forum. Absent a compelling state interest, however, it may not exclude the expression of one religious viewpoint while permitting others.
 
 
 143
 I perceive no evidence of viewpoint discrimination in this record. While this issue is one in which evidence about practices in other fora may be relevant, Centennial's policy with respect to the Adult Evening School does not reflect a bias against any particular religious viewpoint. Nothing in this record suggests that if a group of adult evangelical christians approached the Evening School Director asking for classroom space, it would not be able to discuss evangelical christianity in the same manner that others are permitted to discuss yoga or transcendental meditation. With respect to Godspell and Jesus Christ Superstar, the record similarly will not support a finding that Centennial favors the viewpoint reflected in those musicals over that exposed by Mr. Kole, assuming that there is a difference.[6]
 
 
 144
 Indeed, this record affirmatively shows that the drafters of Centennial's regulations went out of their way to assure that there would be a variety of religious discourse in the school community. Ironically, it was Centennial's willingness to accommodate a variety of religious expression in contexts where such expression would not pose significant problems for the School District and its mission, that caused it to lose its case in the district court and in this court.[7]
 
 E.
 
 145
 In addition to the provisions discussed above, the Centennial Facility Use Policy contains two explicit restrictions:
 
 
 146
 In any event, religious services (defined to include the invocation of, worship service to, prayer to, or adoration of a diety) is prohibited.
 
 
 147
 The sale or distribution of Bibles, testaments, scriptures or religious literature is prohibited.
 
 
 148
 Facility Use Policy II.C.1.d. & f. I think it likely that Centennial could articulate rational bases for enforcing both of these exclusions in the nonpublic facility rental program, although I am uncertain why it would be necessary to do so in light of the exclusion of nonprofit religious groups from this forum. However, because the Facility Use Policy does not expressly confine these restrictions to the nonpublic rental forum, these provisions raise a new set of concerns which have not yet been adequately addressed in these proceedings.
 
 
 149
 The exclusion of worship and literature distribution appears to apply to every fora created by the Policy, including the Adult Evening School and the limited open student forum. These provisions are located in a section of the Policy containing regulations governing facility use in all fora. Moreover, Centennial defends the ban on literature distribution as necessary to comply with the Pennsylvania Court of Common Pleas' injunction in Polster v. Centennial Joint School Board, 16 Bucks 492 (1967), which addressed distribution of Gideon Bibles during school hours, and therefore evidently intends the ban to apply to that forum. At least with regard to literature distribution, I read Student Venture to advance an overbreadth claim in addition to its primary contentions discussed above, arguing that the Polster injunction only justifies prohibiting distribution of literature in a manner connoting school endorsement: "If the Polster injunction is read to require a flat prohibition on any distribution of religious literature by anyone, then the Polster injunction unconstitutionally infringes on the free speech, free press and free exercise of religion rights of students and outside groups who are properly using school facilities." Student Venture's Brief at 40.
 
 
 150
 I am uncertain whether Student Venture has standing to make such an overbreadth argument where the prohibitions under attack could validly be applied to the forum Student Venture seeks access to and where, if my analysis were adopted, Student Venture's claim to worship and distribute literature in that forum would be rendered moot by its valid exclusion from that forum. The current complaint does not allege that plaintiffs wish to engage in the prohibited activities in any of the other fora, although I note that two named plaintiffs are (or at least were) students at William Tennent High School, and there is evidence in the record that members of Student Venture, including one named plaintiff, have distributed religious literature during the school day. App. at 293-302. I would be reluctant to address a difficult standing issue when the complaint could easily be amended to avoid this problem.
 
 
 151
 If these overbreadth arguments are properly pressed in this proceeding, they raise a number of troubling issues which I shall only briefly mention. First, the question of whether students have a right to distribute religious literature on school grounds during the school day is a difficult and close one which this court has not yet resolved. See Thompson v. Waynesboro Area School District, 673 F.Supp. 1379 (M.D.Pa.1987) (holding prohibition on distribution of religious literature unconstitutional); see also Rivera v. East Otero School District R-1, 721 F.Supp. 1189 (D.Colo.1989) (same). Even if the school is considered an open forum for such purposes, see Laycock, supra, at 48-49, Centennial would have an opportunity to demonstrate that prohibiting such distribution is necessary to a compelling interest. A letter from the principal of William Tennent High School suggests that Student Venture's activities during the school day have been disruptive. App. at 293. The Supreme Court has indicated that the decisions of school administrators in these matters must be accorded deference. See, e.g., Hazelwood School Dist. v. Kuhlmeier, 484 U.S. 260, 271-73, 108 S.Ct. 562, 569-71, 98 L.Ed.2d 592 (1988).
 
 
 152
 Next, it appears that the Equal Access Act contemplates allowing students to engage in prayer in the limited student open fora created thereunder. The statute itself provides that "[n]othing in this subchapter shall be construed to authorize the United States or any State or political subdivision thereof--(1) to influence the form or content of any prayer ...; (2) to require any person to participate in prayer...." 20 U.S.C. Sec. 4071(d). These caveats strongly imply that prayer is among the activities a school must allow if it has created a limited open forum under the Act. See also Board of Education v. Mergens, --- U.S. ----, ----, 110 S.Ct. 2356, 2362, 110 L.Ed.2d 191 (1990) (upholding access by group formed "to read and discuss the Bible, the have fellowship, and to pray together."); S.Rep. No. 357, 98th Cong., 2d Sess. 39, reprinted in 1984 U.S.Code Cong. & Admin.News 2349, 2385 ("Section 2(a) recognizes that the denial of permission for students to engage in voluntary extracurricular activities that include prayer or religious speech when a school permits students to meet for nonreligious extracurricular speech is discrimination against religious speech." (Emphasis added)). If this is so, then Centennial's blanket prohibition on worship--if it does apply to the limited student open forum--violates federal law at least when applied to the limited open student forum. Distribution of religious literature may well also be protected under the Act.
 
 
 153
 Finally, I note that even if the Adult Evening School were determined to be a nonpublic forum (an analysis I will not attempt in this opinion), Centennial would still be required to articulate a rational basis for excluding distribution of religious literature from that forum--again, if the prohibition applies to that forum. Since such a distribution might be necessary and appropriate to objective discussions of religious subject matter, I think it would be difficult to defend the prohibition in this context.
 
 
 154
 In short, the blanket prohibitions on worship and distribution of religious literature raise a number of questions of law and fact, wholly unaddressed by the district court and largely unaddressed by the parties, that it would be imprudent for this court to address at this point. I would leave these issues to be explored further on remand.
 
 F.
 
 155
 The result reached by the court today is extremely unfortunate. School facilities are community assets; their utility should be maximized. Liberal facility use policies like that of this school district should, therefore, be encouraged. At the same time, we must be realistic enough to acknowledge that proselytizing a general audience from the school community including parents and young children can have a disruptive effect on the school community and can convey to some an unintended message of partiality on the part of the school district. School board members who have legitimate concerns about such matters should not have to choose between admitting Student Venture to the auditorium and either cutting back dramatically on the number of groups granted access or prohibiting religious discussions among students in the afternoon open forum or among adults in the evening program. Either course would exact a high and, in my view, unnecessary price.
 
 APPENDIX
 
 156
 Excerpts From Centennial School District Facility Use Policy
 
 I. General Provisions
 A. Users Exempt From Fees
 
 157
 The following, listed in priority order, may apply to use the listed facilities for their regular meetings and related special activities for only the fees specified in Section VII.A., provided the use does not conflict with uses of higher priority, or interfere with public school programs or activities; and further provided that admission charges, donations or other considerations are not to be collected, requested or solicited.
 
 
 158
 . Custodial charges will be assessed to these groups when it is necessary to bring in custodians during non-working hours or to add to custodial staff due to the nature of the activity (special set-up, cleaning, etc.).
 
 
 159
 . Where a user desires to put on a special event and accept donations, the additional charges specified in Section III.A.5. shall apply.
 
 
 160
 Groups Applicable
 
 Facility
 
 161
 1. Home and school and/or parent/teacher associations All
 
 Facilities
 
 162
 2. Centennial resident youth groups Classrooms/
 
 
 163
 a. organized sports Gymnasiums
 
 
 164
 b. scouting organizations Grounds
 
 
 165
 c. Indian Guides/Princesses
 
 
 166
 d. organized cheerleaders
 
 
 167
 3. Centennial booster organizations (school affiliated) All
 
 Facilities
 
 168
 4. Centennial resident civic, cultural and service organizations All
 
 
 169
 having a majority of Centennial resident membership and/or Facilities
 
 
 170
 an on-going connection with the Centennial community.
 
 
 171
 a. Civic: Centennial resident neighborhood
 
 
 172
 associations organized for the purpose of
 
 
 173
 discussion of neighborhood affairs
 
 
 174
 b. Cultural: Centennial resident music, artistic,
 
 
 175
 play associations organized for the purpose of
 
 
 176
 rehearsing, performance of music compositions
 
 
 177
 plays or arts displays
 
 
 178
 c. Centennial Resident Service Organizations:
 
 Rotary, Kiwanis, Lions, Jr. Chamber of
 Commerce and like non-sectarian service
 
 179
 organizations.
 
 
 180
 5. Centennial resident adult recreational groups having a Gymnasiums/
 
 
 181
 majority of Centennial resident membership and/or an Grounds
 
 
 182
 on-going connection with the Centennial community.
 
 
 183
 6. Centennial staff groups (limited to staff attended functions All
 
 
 184
 only). Facilities
 
 
 185
 Note: All groups listed above must be open to all otherwise qualified
 
 
 186
 residents regardless of race, ethnic background and/or religion.
 
 
 
 B. Evening School
 The Evening School shall function as an activity wherein the basic emphasis shall be upon (1) Adult Basic Education (A.B.E.), for foreign-born residents and other adults who wish to improve their basic English skills and to prepare to the G.E.D., and (2) for the High School Equivalency Diploma (G.E.D.). General classes shall be as schedulred, upon a showing of interest sufficient to justify the expense. Persons or groups seeking an "open forum" for free expression of ideas may make special arrangements to rent classroom space (see VII.A) to teach such ideas in an objective manner through the Evening School Director. Arrangements must be made three months in advance of the projected course start-up date.
 C. Users Subject to Fees (See VII.A)
 The following groups may make application for use of auditoriums, subject to the priorities of school use, with the understanding that established fees are above District cost and the all projected fees must be paid in advance:
 
 
 [1]
 Community based employee associations and labor unions (limited to members only) for meetings only
 
 
 [2]
 Commercial profit making ventures which charge admission or sell tickets for the staging of plays and/or musical performances suitable for general audiences
 
 
 [3]
 College/university course offerings/usage (classroom use only )
 ....
 V. Limited Open Student Forum (Title VIII Sec. 801-3)
 A. Student Participation
 A "limited open student forum" (meeting) may be requested by any secondary student or students enrolled in the Centennial School District who desire(s) to voluntarily initiate a meeting (to be held in an assigned area at no cost to the School District) in order to peacefully and with appropriate decorum discuss religious, political, philosophical or other topics which are not related to the curriculum, and wherein the School District or its employees will not be involved in any way in sponsorship of such meeting or discussion.
 
 
 [1]
 Space for such a meeting shall be requested of the building principal twenty school days in advance
 
 
 [2]
 Requests may be granted only on days that school is actually open for students during the 180-day school year, and staff and space are available on a first-come basis exclusively during non-instructional time
 a. High School--between 2:15 and 3:00 p.m.
 b. Junior High Schools--between 2:45 and 3:30 p.m.
 
 
 [3]
 The principal may assign a school employee to maintain decorum, order and discipline, to protect students, faculty and property, and to determine that student attendance is indeed voluntary. This monitoring activity is not to be construed as School District sponsorship
 
 
 [4]
 During working hours school employees are prohibited from either promoting, leading or participating in such meeting(s) or requiring any student to participate in any such meeting(s)
 ....
 B. Non-School Person or Non-School Group Participation in the Limited Student Forum
 
 
 [1]
 No non-school person or non-school group shall be admitted to any limited open student forum without the written invitation and consent of the student or students initiating the meeting and advance specific School Board approval. A request for Board approval shall be filed with the principal thirty calendar days in advance of the projected meeting date stating the name, address and affiliation of the non-school persons or non-school groups desiring to be present
 
 
 [2]
 Any non-school person or non-school group seeking to participate in any way in the open student forum shall provide the required certificate of insurance under Sec. 6.A.3
 
 
 [3]
 In any event, non-school person(s) or non-school group(s) are prohibited from controlling, conducting or regularly attending any and all limited student open forum(s), and the School District reserves the right to limit or to revoke any privilege granted to such person(s) or group(s) or to exclude such person(s) or group(s) entirely
 
 
 [4]
 Policy 5.8, "Utilization of Outside Speakers in the Instructional Program", shall not apply to requests under this policy
 C. Should Title VIII Sec. 801-3 [the Equal Access Act] be declared by a court of competent jurisdiction to be invalid or unconstitutional, this Policy Section shall be null and void.
 
 
 *
 Honorable Edwin M. Kosik of the United States District Court for the Middle District of Pennsylvania, sitting by designation
 
 
 [1]
 This statement was apparently premised on the establishment clause of the Pennsylvania state constitution. On appeal Centennial does not base any part of its argument on Pennsylvania law
 
 
 [2]
 Although Student Venture has, in the past, sought access only to the high school auditorium, the parties have consistently defined the relevant forum to consist of all of the facilities at the William Tennent High School. Since Student Venture claims a right to general facilities access, our discussion presumes the adoption of the parties' definition. "When speakers seek general access to public property, the forum encompasses that property." Cornelius, 473 U.S. at 801, 105 S.Ct. at 3448. We note that the dissent does not adopt Centennial's definition of the relevant forum as "all the school property" but argues instead that there are several relevant fora, completely distinct from each other and implicating different legal precepts
 
 
 [3]
 Student Venture notes our decision in Malnak v. Yogi, 440 F.Supp. 1284 (D.N.J.1977) aff'd per curiam, 592 F.2d 197 (3d Cir.1979), which held that transcendental meditation is religion which, when taught to high school students as a part of the curriculum, violates the establishment clause
 
 
 [4]
 The policy specifically creates an open forum for evening adult education classes
 
 
 [5]
 This appeal does not present a challenge to the constitutionality or scope of the Equal Access Act. The parties do not base their arguments on the Act and our analysis does not turn on the Act per se. We note, however the Supreme Court's recent decision in Board of Education v. Mergens, --- U.S. ----, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990). While the case before us involves issues not directly controlled by Mergens, we find the Court's logic instructive
 
 
 [6]
 The conversion element of Student Venture's speech is not clear from the record. It appears that Andre' Kole performed his acts of illusion and, after an intermission, told of his investigation of the miracles of Christ and delivered a personal account of how he had come to his faith. There was no altar call or overt commitment sought. In support of its conversion argument, Centennial relies primarily on Student Venture's amended complaint in which Student Venture admits evangelical Christian beliefs and characterizes the Kole program as one designed to entertain and present the Christian gospel message
 
 
 [7]
 We take issue with the dissent's conclusory statement that "Centennial has a rational basis for distinguishing between the use of school facilities by Student Venture and their use by local special interest groups consisting of district residents whose families pay the tax bills.... While Student Venture has resident members, it is not an organization whose purpose is to serve the needs of the residents of the school district." Dissent at 1389 (emphasis added). This assessment of which organizations, labor unions, neighborhood associations, or religious groups, serve the "needs" of the Centennial school district is value laden and does not find support in the record
 
 
 [8]
 The dissent's conclusion that most non-profit and charitable organizations would seek facilities access solely to proselytize or raise funds is, in our view, misplaced, and fails to take into account the public education function often served by these groups
 
 
 [9]
 Just as this case is not Student Coalition for Peace, it is not, as the dissent argues, Lehman v. City of Shaker Heights, 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974), nor does Lehman undermine our conclusions regarding the forum here. The Court's decision in Lehman supports the proposition that the nature of the property and its compatibility with expressive activity are important in determining intent. Lehman had little to do with the different types of speech allowed but everything to do with the nature of the property. The Court in Lehman found that the city, rather than creating a public forum, was engaged in commerce and the restriction on political advertising was incidental to that effort. The Court found that during the twenty-six years of public operation, the Shaker Heights system had never accepted public issue or political advertising on the ground that its revenue could be jeopardized, the advertising might offend a captive audience, and favoritism concerns could arise in the context of allocating limited space. The rationale underlying the decision in Lehman does not, in our view, extend to this case
 
 
 [10]
 See also Bender v. Williamsport Area School Dist., 741 F.2d 538 (3d Cir.1984), vacated on other grounds, 475 U.S. 534, 106 S.Ct. 1326, 89 L.Ed.2d 501 (1986) (nothing precludes existence of public forum in a high school setting although the public forum is unlikely); Thompson v. Waynesboro Area School Dist., 673 F.Supp. 1379 (M.D.Pa.1987), affirmed by an equally divided court, (No. 88-5235, 3d Cir. May 31, 1989) (high school created limited public forum restricted to student groups); Country Hills Christian Church v. Unified School District, 560 F.Supp. 1207 (D.Kan.1983) (open forum created in elementary school)
 
 
 [11]
 While the dissent characterizes this policy as "sketchy" the document consisted of some eleven pages detailing the terms under which facilities access would be permitted
 
 
 [12]
 The impressionability argument, even if it were persuasive in this context, cuts two ways. If we presume, as Centennial would have us do, that students and parents are incapable of understanding the lack of endorsement when equal access is granted, it is at least as likely that they will misapprehend the exclusion of religious speech as discrimination against religion
 
 
 [13]
 Our conclusions here are confined to the forum at issue. The concern expressed in the dissent concerning possible uses of elementary school facilities within the Centennial school district as a result of this opinion is without foundation
 
 
 [14]
 While we have predicated our analysis on the finding of a designated open forum and have, consequently, applied strict scrutiny analysis to the facts before us, we are by no means convinced that the reasons advanced by Centennial for excluding Student Venture could withstand review even under a rational basis standard
 
 
 [15]
 Despite the fact that a challenge to Centennial's ban on distribution of religious literature was included in Student Venture's Second Amended Complaint and was raised again at oral argument on the permanent injunction, the district court declined to resolve this issue on the merits. Centennial argues that a permanent injunction enjoining it from prohibiting distribution of religious literature will conflict with the Pennsylvania Court of Common Pleas' decision in Polster v. Centennial Joint School Board, 16 Bucks 492 (1967). In that case, the state court issued a permanent injunction enjoining Centennial from
 distributing or permitting to be distributed on any public school premises ... copies of the Testament consisting of the King James Version of the New Testament and the Psalms and Proverbs of the Old Testament made for the Gideons ... and furnished to [Centennial] free of charge by the Gideons International for distribution.
 Id. at 504.
 We think it clear that the Polster injunction was directed to distribution of bibles in a manner that implies school endorsement, i.e., through school channels during school hours. That situation is not presented here where only after-hours distribution through non-school channels is contemplated. We do not believe that Centennial's total ban on distribution of religious literature is mandated by Polster; indeed, Polster is inapplicable to the facts of this case.
 
 
 [16]
 For a discussion of distribution of religious material in a related context, see, Thompson v. Waynesboro Area School Dist., supra, note 7
 
 
 [1]
 The court summarizes its holding, for example, as follows:
 Centennial must be consistent in granting facilities access: where it permits potentially divisive or conversion-oriented speech by outsiders to a student audience in school facilities in the afternoon, it cannot, on maturity grounds, exclude the same type of speech directed to the same audience from its facilities in the evening. Where it identifies student-directed conversion speech as its criterion for exclusion, it cannot reasonably allow some members of some groups to meet with each other and deny access to others whose speech does not implicate this conversion element.
 At 1379.
 
 
 [2]
 The majority's reliance on Board of Education v. Mergens, --- U.S. ----, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990) in this regard is misplaced. At 1375, 1378-1379, 1382-1383. Writing for the majority, Justice O'Connor made it clear that Congress' "deliberate choice" to use the term "limited open forum" in the Equal Access Act rather than "limited public forum" "can only mean that it intended to establish a standard different from the one established by our free speech cases." --- U.S. at ----, 110 S.Ct. at 2367. Thus, the Supreme Court explicitly disavowed any implications of Mergens in the free speech context
 For example, the majority states that "[i]n light of the Supreme Court's decision in Mergens it is now clear that a secondary school may, by its acts, create a public forum implicating the same constitutional rules set forth in Widmar." At ----. While I do not disagree with the basic proposition asserted, it cannot be found in Mergens, which states "if Congress really intended to incorporate Widmar for reasons of administrative clarity, Congress kept its intent well hidden, both in the statute and in the debates preceding its passage." --- U.S. at ----, 110 S.Ct. at 2368 (brackets omitted, paraphrasing dissent).
 
 
 [3]
 The Supreme Court first identified three distinct types of fora--traditional public fora, designated public fora, and nonpublic fora--in Perry Education Association v. Perry Local Educators' Association, 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). Perry contains language suggesting that a forum can be intentionally dedicated by a public entity as a "limited public forum" and that speakers or topics within the ambit of the dedication cannot be excluded without showing a compelling state interest. 460 U.S. at 46 n. 7, 103 S.Ct. at 955 n. 7. While I confess that I am unsure of the continuing vitality of the "limited public forum" concept after Cornelius, see Post, Between Governance and Management: The History and Theory of the Public Forum, 34 UCLA L.Rev. 1713, 1745-58 (1987) (arguing Cornelius "tactfully withdrew the concept of the limited public forum as a meaningful category of constitutional analysis"), I believe it has no application to the case before us. It may well be that if a governmental entity creates a forum dedicated to expressive activity by a particular class of speakers or to particular subject matter, strict strutiny of any exclusion of a member of the class or of a speaker seeking to address the stipulated subject matter is required unless and until the forum is redefined or terminated. See, e.g., Widmar v. Vincent, 454 U.S. 263, 267 n. 5, 102 S.Ct. 269, 273 n. 5, 70 L.Ed.2d 440 (1981) (university campus is open forum with regard to students only); City of Madison Joint School District v. Wisconsin Public Employment Relations Comm'n, 429 U.S. 167, 174-75, 97 S.Ct. 421, 425-26, 50 L.Ed.2d 376 (1976) (school board meeting is public forum with regard to school business). But where, as here, there is an express definition of the forum at the time of its creation and the definition has been consistently applied, speakers or speech that does not come within the definition can be excluded so long as there is a rational basis for the exclusion in light of the purpose of forum and no viewpoint discrimination. See Deeper Life Christian Fellowship v. Board of Educ., 852 F.2d 676, 679-80 (2d Cir.1988) ("Under the limited public forum analysis, property remains a nonpublic forum as to all unspecified uses, and exclusion of uses--even if based upon subject matter or the speaker's identity--need only be reasonable and viewpoint neutral to pass constitutional muster." (Citations omitted)). In other words, a public entity can expressly limit the terms of the dedication without showing a compelling state interest for all excluded speakers and topics
 
 
 [4]
 With regard to both these justifications it is important to realize that there is no reason to believe the audiences for religious functions on school property will be confined to secondary school students and adults. (In fact, the Centennial School District's Facility Use Policy covers facilities throughout the entire District, including elementary schools; the injunction ordered in this case will apply equally to all these facilities). For example, it is likely that public elementary school students were present during Andre Kole's performance. Even if parents are responsible for sending their children to such an event, it is quite plausible that the presence of a religious function in a building the impressionable child associates with the legitimate indoctrinating power of the state, see Ambach v. Norwick, 441 U.S. 68, 76-77, 99 S.Ct. 1589, 1594-1595, 60 L.Ed.2d 49 (1979), will convey a strong message of official endorsement of religion
 
 
 [5]
 The court's opinion critiques Centennial's argument that it was concerned with proselytizing religious speech by noting that in Andre Kole's performance "[t]here was no altar call or overt commitment sought." At 1376 n. 6. A speaker need not distribute membership applications or perform baptisms in order to attempt to obtain new adherents to her views. In fact, the Complaint states that plaintiffs "all have evangelical Christian beliefs, including a sincere religious belief about evangelizing people, in order to convert them to believe in Jesus Christ as Lord and Savior." Second Amended Complaint p 7.2
 
 
 [6]
 Displaying art or drama having a religious theme while excluding all religious speech that can be understood to urge affiliation with a particular religion has not been considered by the Supreme Court to be viewpoint discrimination. For example, in Abington School Dist. v. Schempp, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963), the Court struck down the practice of beginning each day with readings from the Bible on the ground that the practice had a manifestly religious purpose, but at the same time explicitly endorsed study of the Bible in public schools either as a work of literature or in the course of an objective study of religion, and denied that such a distinction constitutes a bias against religion:
 It is insisted that unless these religious exercises are permitted a "religion of secularism" is established in the schools. We agree of course that the State may not establish a "religion of secularism" in the sense of affirmatively opposing or showing hostility to religion, thus "preferring those who believe in no religion over those who do believe." We do not agree, however, that this decision in any sense has that effect. In addition, it might well be said that one's education is not complete without a study of comparative religion or the history of religion and its relationship to the advancement of civilization. It certainly may be said that the Bible is worthy of study for its literary and historic qualities.
 Id. at 225, 83 S.Ct. at 1573. The Court in Abington thereby made the same type of distinction within the general subject matter of religion that is arguably presented in this case, and denied that such a distinction represented impermissible viewpoint discrimination. Furthermore, this same distinction is made in public schools every day, for example when Paradise Lost or Pilgrims' Progress--words with a manifestly religious message--are taught as works of literature in English classes.
 
 
 [7]
 Student Venture's equal protection claim does not merit a higher level of scrutiny than the scrutiny appropriate to exclusions from a nonpublic forum; since such an exclusion is not a burden on a fundamental right, the defendant need only articulate a rational basis for the distinction being made. Perry, 460 U.S. at 54, 103 S.Ct. at 959