

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-25-1998

# Christ's Bride v. SEPTA

Precedential or Non-Precedential:

Docket 96-1829

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"Christ's Bride v. SEPTA" (1998). *1998 Decisions.* Paper 145.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/145

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed June 25, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 96-1829

CHRIST'S BRIDE MINISTRIES, INC.,

     Appellant

v.

SOUTHEASTERN PENNSYLVANIA TRANSPORTATION
AUTHORITY; TRANSPORTATION DISPLAY'S INC.

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil Action No. 96-cv-03631)

Argued May 21, 1997

Before: GREENBERG, ROTH and WEIS, Circuit Judges

(Opinion Filed June 25, 1998)

       Mathew D. Staver, Esq.
       Frederick H. Nelson, Esq. (Argued)
       Nicole Arfaras Kerr, Esq.
       Liberty Counsel
       1900 Summit Tower Boulevard
       Suite 560
       Orlando, FL 32810

       James T. Owens, Esq.
       25 South Church Street
       Westchester, PA 19382-3220

        Attorneys for Appellant

William H. Roberts, Esq. (Argued)
Jordana Cooper, Esq.
Daniel H. Wheeler, Esq.
Blank, Rome, Comisky & McCauley
1200 Four Penn Center Plaza
Philadelphia, PA 19103

Seth Kreimer, Esq.
3400 Chestnut Street
Philadelphia, PA 19104

David Rudovsky, Esq.
Kairys & Rudovsky
924 Cherry Street
Fifth Floor
Philadelphia, PA 19107

 Attorneys for Appellees

Tina Kowalsky Haut, Esq.
275 Madison Avenue
New York, NY 10016

 Attorney for Appellee
 Transportation Display's Inc.

C. Neil Peterson, Esq.
1234 Market Street
Philadelphia, PA 19107

 Attorney for Appellee Southeastern
 Pennsylvania Transportation
 Authority

OPINION OF THE COURT

ROTH, Circuit Judge:

Southeastern Pennsylvania Transportation Authority (SEPTA) refused to display an advertisement stating that "Women Who Choose Abortion Suffer More & Deadlier Breast Cancer." We must decide in this appeal whether, in doing so, SEPTA, a regional transportation authority, violated the First Amendment rights of the advertiser, Christ's Bride Ministries, Inc. (CBM). The district court

found, after conducting a bench trial, that the First Amendment was not violated because the advertising space at issue did not constitute a public forum and because SEPTA acted reasonably in removing the posters. We do not agree with either conclusion. In light of the other advertisements, including those relating to abortion, which SEPTA had previously permitted to run on its property, and in light of SEPTA's own purposes in using and leasing the space, we have determined that SEPTA intended to create a designated public forum. We find that SEPTA's action in removing the posters does not survive the strict scrutiny applied to speech within the parameters of a designated public forum; nor does it pass the reasonableness test applied where property of a governmental agency has not been designated a public forum.

I. Background

SEPTA is an "agency and instrumentality" of the Commonwealth of Pennsylvania, 74 Pa. Cons. Stat. Ann. S 1502. It operates buses, subways, and regional rail lines in and around the City of Philadelphia. SEPTA contracts with a licensee, Transportation Display's Inc. (TDI), for the construction and sale of advertising space in its stations and in and on its vehicles. TDI and SEPTA are the defendants in this case.

The plaintiff, CBM, began a public service campaign in 1995 to inform the public of what it believes to be the increased risk of breast cancer for women who have had abortions. As part of this campaign, CBM sought to display posters in train and subway stations and on buses and at bus stops in major urban areas, including Baltimore, Washington, and Philadelphia.

CBM contacted SEPTA in late November 1995 about placing posters in the Philadelphia area transit system. SEPTA referred CBM to TDI. Bradley Thomas, president of CBM, subsequently spoke with Robert R. Meara, Vice President and Regional Manager at TDI. In December 1995, Thomas sent a draft poster to TDI for review by Meara and SEPTA. The poster stated "Women Who Choose Abortion Suffer More & Deadlier Breast Cancer." The district court described the poster as "graphically designed with bold

white lettering on a background of black and bright red, except that the word `deadlier' was written in red." The poster also included a 1-800 number for information which connected callers not with CBM but with an organization called the American Rights Coalition (ARC).

SEPTA requested that the poster better identify the sponsor, CBM. CBM complied and added a description of CBM: "Christ's Bride Ministries, Inc. is a charitable, religious, educational, non-profit 501(c)(3) organization. CBM, P.O. Box 22 Merrifield, VA 22116. (703) 598-2226." SEPTA then approved the posters for display.

On January 15, 1996, the posters went up. TDI put two of them next to overhead clocks in Suburban Station in Philadelphia, and 24 others in subway and railroad stations in Philadelphia and its suburbs. SEPTA immediately began receiving what it described as "numerous" complaints about the poster, which included "rider protest" and"criticism" by "women's health organizations" and "local government officials." Shortly thereafter, Robert Meara told CBM that SEPTA wanted CBM to identify itself more prominently on the posters. CBM accordingly added decals to the signs that identified and described CBM with larger and bolder type.

After the posters were installed, TDI faxed to CBM a contract, which Thomas signed and returned to TDI, also via fax. The contract was signed by Robert Meara of TDI and dated January 22, 1996. The contract provided that 46<!DAG> x 60<!DAG> posters would be displayed at 24 locations in rail stations for one year. The contract also stated that during that year two 21<!DAG> x 62<!DAG> signs would be displayed on clocks at Suburban Station. The monthly charge for the signs on the clocks was $642.60, while the monthly charge for the 24 other posters was $2400. There were "terms and conditions" on the back of the contract, including one that stated "if the Transportation Facility concerned should deem such advertising objectionable for any reason, TDI shall have the right to terminate the contract and discontinue the service without notice."

In early February, SEPTA received a copy of a letter written by Dr. Philip Lee, Assistant Secretary of Health in the United States Department of Health and Human

4

Services. The letter was not addressed to anyone in SEPTA, but instead to Lawrence Reuter, General Manager of the Washington Metropolitan Area Transit Authority, where CBM's posters were also displayed. Dr. Lee wrote to Reuter that

> It has recently come to my attention that the Metro Transit System has posted more than 1,100 free public service ads from the Christ's Bride Ministries. The ad states: "Women who choose abortion suffer more & deadlier breast cancer. Information: 1-800-634-2224." This ad is unfortunately misleading, unduly alarming, and does not accurately reflect the weight of the scientific literature.

Dr. Lee went on to state that in his opinion the studies showing a link between breast cancer and abortion suffered from methodological weaknesses, that there was no consensus on the purported relationship between breast cancer and abortion, and that Dr. Lee knew of no evidence supporting the claim that abortion causes "deadlier" breast cancer. Dr. Lee also complained that callers to the 1-800 number were referred to an article in the Journal of the National Cancer Institute, describing a study that suggested a positive correlation between induced abortions and breast cancer. Dr. Lee noted that although the article did appear in the Journal, the Journal also published an editorial stating that the results were not "conclusive." Finally, Dr. Lee expressed concern that callers to the 1-800 number were being asked to participate in a survey and that callers could become confused and think that the National Cancer Institute supported the survey, which it did not.

Based on Dr. Lee's letter, SEPTA removed the posters on February 16, 1996. According to the testimony of Mr. Gambaccini, SEPTA's General Manager, the "heart" of the decision to remove them was the questions about their accuracy. The 1-800 number concerns were an "ancillary" consideration. It is uncontested that no one at SEPTA or TDI conducted any other inquiry into the accuracy of the message on the poster, or contacted CBM for information that would support the claim made by the ad, or informed CBM of SEPTA's objections to the ad before removing the posters.

5

On March 13, 1996, nearly a month later, Meara of TDI wrote to Thomas of CBM, explaining that the posters had been removed on February 16. Meara stated in his letter that the decision had been made by SEPTA as a result of "a letter from the U.S. Department of Health and Human Services in which it concluded that the ad was `unfortunately misleading, unduly alarming and does not accurately reflect the weight of the scientific literature'." TDI included a check to CBM for $3,042.60 for the "unused portion" of the contract. CBM had paid a total of $6,086 for two months of advertising.

CBM filed suit on May 10, 1996, naming SEPTA and TDI as defendants. The complaint alleged violations of CBM's rights under the First and Fourteenth Amendments and also alleged breach of contract. CBM sought compensatory damages and declaratory and injunctive relief pursuant to 42 U.S.C. SS 1983, 1985(c) and 1986.[1] The United States District Court for the Eastern District of Pennsylvania conducted a three-day bench trial in June 1996. The court heard testimony about SEPTA's and TDI's policies and practices regarding advertising space on SEPTA property, as well as testimony from experts about the alleged link between breast cancer and induced abortions.

During the trial, three experts testified that the existing studies and research do not support the existence of a cause and effect relationship between abortion and breast cancer. These experts did, however, acknowledge that some studies show a weak "association" between induced abortions and breast cancer. One of SEPTA's experts

_____

1. CBM has not appealed the district court's rejections of its claims under 42 U.S.C. SS 1985 and 1986. CBM has, however, objected to the district court's denial of its breach of contract claim. It argues that it only received one page of the two page contract and that there was no "meeting of the minds" as to the terms of the contract between it and TDI. The complaint does not make this allegation, however. CBM also attached both pages of the contract to the complaint and relied on language from the allegedly missing second page in the complaint itself. CBM also argues that the contract is "unconscionable," although the complaint makes no such allegations. We reject these claims as being without merit.

testified that the better studies have not been consistent and that some studies show no link at all.

CBM's expert, on the other hand, testified that he had analyzed 23 epidemiological studies, 12 of which, in his opinion, showed a statistically significant increase in breast cancer among women who had undergone induced abortions. He argued that this risk could not be accounted for by the presence of other variables, such as age or family. The increased risk, CBM's expert noted, was greater than the relative risk associated with oral contraceptives. Because manufacturers of contraceptives alert the public as to the possible link between their product and breast cancer, it should not be "unduly alarming" for CBM to report a slightly greater risk purportedly associated with induced abortions.

The district court issued an opinion on August 16, 1996, holding for the defendants on all counts. The court reasoned that public transit stations do not constitute traditional public fora and that SEPTA and TDI had not created a public forum because they maintained control over the use of the advertising space. The court also found that Dr. Lee's letter was a "reasonable" basis on which to remove the advertisement. The court commented that "ultimately a consensus may develop" as to the link between breast cancer and abortion but "at this time we do not know." The court did not decide whether either SEPTA's or CBM's experts were "right."

CBM timely appealed to this Court. We have jurisdiction under 28 U.S.C. S 1291.

II. Standard of Review

In evaluating the claim that CBM's First Amendment rights have been violated, we have a "constitutional duty to conduct an independent examination of the record as a whole, without deference to the trial court." Hurley v. Irish-American Gay Group of Boston, 115 S.Ct. 2338, 2344 (1995). This independent duty does not extend to the district court's rulings on matters of credibility, to which we continue to defer, id. (citing Harte-Hanks Communications, Inc. v. Connaughton, 491 U.S. 657, 688 (1989)), but it does require us draw our own inferences from the factual

7

evidence presented. United States v. Antar, 38 F.3d 1348, 1357 (3d Cir. 1994); Swineford v. Snyder Co. Pa., 15 F.3d 1258, 1165 (3d Cir. 1994).

III. State Action and Commercial Speech

Turning to the substantive issues, we readily dispose of two initial matters. First, the United States Constitution guarantees freedom of expression only against infringement by the state, not by private actors. Hurley v. Irish-American Gay Group of Boston, 115 S.Ct. 2338, 2344 (1995). In this case, however, the parties agree that SEPTA is a state actor, as is its licensee, TDI, and that their actions are constrained by the First and Fourteenth Amendments.

Second, the posters come within the ambit of speech fully protected by the First Amendment. The defendants argue that because callers to the 1-800 number listed on the poster may receive information advertising the services of medical malpractice attorneys, CBM's message is thereby transformed into "commercial speech," and should receive substantially less constitutional protection. See Bolger v. Youngs Drug Prods. Corp., 463 U.S. 60, 66-67 (1983). But the speech at issue does not advertise goods or services, nor does it refer to a specific product or service. The 1-800 number listed on the poster does not even connect callers to CBM. Any economic motive of CBM for posting the advertisement is very attenuated at best. See U.S. Healthcare v. Blue Cross of Gr. Philadelphia, 898 F.2d 914, 932-933 (3d Cir. 1990). The speech involved is accordingly not "commercial," at least in the sense that it is afforded less protection under the First Amendment.

IV. Public Forum

The government may, as a general rule, limit speech that takes place on its own property without running afoul of the First Amendment. Lamb's Chapel v. Center Moriches Union Free School Dist., 508 U.S. 384, 390 (1993); Perry Educ. Ass'n. v. Perry Local Educators' Ass'n, 460 U.S. 37, 46 (1983). Where, however, the property in question is either a traditional public forum or a forum designated as public by the government, the government's ability to limit speech is impinged upon by the First Amendment. Perry, 460 U.S. at 45-46. In either a traditional or a designated

8

public forum, the government's content-based restrictions on private speech must survive strict scrutiny to pass constitutional muster. Id.; International Society for Krishna Consciousness, Inc. v. Lee, 505 U.S. 672, 678 (1992). The government has, however, a far broader license to curtail speech if the forum has not been opened to the type of expression in question. In such a case, the government's restrictions need only be viewpoint neutral and "reasonable in light of the purpose served by the forum." Rosenberger v. Rector and Visitors of the Univ. of Va., 115 S.Ct. 2510, 2516-2517 (1995) (quoting Cornelius v. NAACP Legal Defense and Educ. Fund, Inc., 473 U.S. 788, 806 (1985)); Kreimer v. Bureau of Police for the Town of Morristown, 958 F.2d 1242, 1262 (3d Cir. 1992).

In order to decide whether a public forum is involved here, we must first determine the nature of the property and the extent of its use for speech. The Supreme Court wrestled with a similar question in Cornelius v. NAACP Legal Defense and Educ. Fund, Inc., 473 U.S. 788 (1985), when it considered whether legal defense funds could be excluded from a charity drive among federal employees. The government argued in Cornelius that the "federal workplace" was the relevant forum. The plaintiffs on the other hand maintained that the forum consisted only of the charity drive itself. Id. at 800. The Court defined the forum in terms of the access sought by the plaintiff. It accordingly rejected the view that the entire workplace was the proper forum, because the plaintiffs sought only to join the charity drive, not to engage in actual, face-to-face solicitation in the workplace. Id. at 801. The Court went on to conclude that the charity drive itself did not constitute a public forum and that the restrictions on participation were reasonable.

In this case, the district court variously defined the forum at issue as "the stations in a public transit system," a "public transportation system," and "SEPTA's subway and rail stations and their advertising space." Applying the reasoning of Cornelius, we look to the access sought by CBM. CBM did not seek to leaflet, demonstrate, or solicit in the rail and subway stations as a whole. Instead, it sought access only to the advertising space leased out by SEPTA, through TDI. The contract between the parties

9

contemplated advertising with posters in the stations and next to the clocks at Suburban Station in Philadelphia. We conclude, therefore, that the forum at issue is SEPTA's advertising space. See, Airline Pilots Assoc. v. Dept. of Aviation of the City of Chicago, 45 F.3d 1144, 1151 (7th Cir. 1995) (holding that display diorama in airport, not entire concourse, constituted relevant forum); Lebron v. Nat'l. R.R. Passenger Corp., 69 F.3d 650, 655–656 (holding that one billboard was the relevant forum, not the entire Penn Station); New York Magazine v. Metropolitan Transp. Auth., 136 F.3d 123, 130 (2d Cir. 1998) (holding that because MTA allowed both commercial and political speech, the outside of MTA buses is a designated public forum).2

Our next step is to decide whether SEPTA's advertising space is a public forum. It clearly does not constitute a "traditional" public forum, archetypal examples of which include streets and parks. These areas have been"held in the public trust," Lee, 505 U.S. at 680, and dedicated to expressive activity for "time out of mind." Id. (quoting Hauge Committee for Industrial Organization, 307 U.S. 496, 515 (1939)). We agree with the district court that the advertising space in the stations is not a traditional public forum. We do not understand CBM to argue otherwise.

More difficult is the question whether SEPTA has created a designated public forum by "expressly" dedicating its advertising space to "speech activity." U.S. v. Kokinda, 497 U.S. 720, 726–727 (1990) (plurality opinion). A designated

_____

2. The parties have not argued that the relevant forum is actually just advertising space in the stations, to the exclusion of space leased on and inside SEPTA vehicles. Because SEPTA stated that it used different standards in evaluating advertisements that appeared as wrap–around bus ads, one could conclude that these types of ads are a separate forum. See Lebron, 69 F.3d at 655 (one billboard, not all of the billboards
in Penn Station, constituted the relevant forum because the billboard was unique and the speaker sought access only to that specific billboard), but see Lebron, 69 F.3d at 661 (Newman, C.J. dissenting) (arguing that "public forum analysis cannot be so particularized as to focus on one of several billboards on government property"). Whether we consider the limitations on wrap–around bus ads as creating a separate forum, or merely a particular limitation within the larger forum of SEPTA's advertising space, our disposition of the case remains the same.

10

public forum is created because the government so intends. Inaction does not make such a forum; neither does the allowance of "limited discourse." Cornelius, 473 U.S. at 802. We accordingly look to the authority's intent with regard to the forum in question and ask whether SEPTA clearly and deliberately opened its advertising space to the public. Hazelwood School Dist. v. Kuhlmeier, 484 U.S. 260, 269–270 (1988); Perry, 460 U.S. at 37. To gauge SEPTA's intent, we examine its policies and practices in using the space and also the nature of the property and its compatibility with expressive activity. Gregoire v. Centennial School District, 907 F.2d 1366, 1371 (3d Cir. 1990) (citing Cornelius, 473 U.S. at 802); Brody v. Sugzdinis, 957 F.2d 1108, 1117 (3d Cir. 1992). Restrictions on the use of the forum, however, do not necessarily mean that SEPTA has not created a public forum. They may demonstrate instead that SEPTA intended to create a limited public forum, open only to certain kinds of expression. See, e.g., Kreimer, 958 F.2d at 1261 (public library constituted a limited public forum for "reading, writing and quiet contemplation," but not for "oral and interactive" First Amendment activities); Rosenberger v. Rector and Visitors of the Univ. of Va., 115 S.Ct. 2510, 2517 (1995) (student activities fund, available to student groups meeting certain criteria, constituted limited public forum).

A. SEPTA's policies

We will look first at the purpose for which SEPTA uses the space in question. The main function of the advertising space at issue is to earn a profit for SEPTA. Although SEPTA generates approximately 99.5% of its revenues through the operation of the public transit system, it does derive about one half of one percent of its operating budget from the leasing of advertising space in its stations and in and on its vehicles. The contract between TDI and SEPTA states that "it is understood that it is Licensee's obligations [sic] under the terms of this contract to produce revenues . . .."3

_____

3. That the generation of income is a goal of the advertising space is also
reflected in the manner in which SEPTA is paid by TDI under the

11

The record shows that TDI and SEPTA also had a secondary goal in using the space: promoting "awareness" of social issues and "providing a catalyst for change." These objectives are stated in the "TDI Cares" brochure. The "TDI Cares" program, in which SEPTA participates, seeks to " `give back' to the communities which[TDI] serve[s] in many ways . . .." In this program TDI picks an issue of public concern and then pays for the materials and labor involved in creating the advertisements. The purpose of the program, in TDI's words, is to assail TDI markets with "images, both poignant and creative, which are designed to elevate awareness and provide a catalyst for change." This page of the brochure is headed "consciousness" and states that the program tries to "focus consciousness on an issue of pressing human concern." The testimony at trial was that SEPTA participated in TDI's annual campaign by donating unsold advertising space. SEPTA and TDI "jointly agree" on what initiatives will run in the Philadelphia area, but it is not clear from the record which ads ran on SEPTA property under this program.4

SEPTA argues that where the government runs a commercial operation, a "bright-line rule" directs that no public forum has been created. For this proposition, SEPTA

_____

contract. TDI guarantees a minimum annual payment to SEPTA, one twelfth of which is due at the beginning of each month, but SEPTA receives fifty-five percent of all net sales in any given month if that amount is greater than one twelfth of the guaranteed annual payment. In the first agreement year, the guaranteed annual payment was $2,000,000. This rose to $2,950,000 for the fifth and final agreement year.

4. SEPTA contends that we should not consider the TDI Cares brochure because it is hearsay. The brochure was, however, admitted into evidence without objection by SEPTA. Moreover, it was offered not for the truth of the matter asserted but for the fact that the assertions were made -- which is not hearsay. In addition, the brochure plays little role in our decision. There is no evidence on the record of which ads actually ran in the campaigns described in the brochure or of how much advertising space SEPTA and/or TDI actually donated to those campaigns. Considered with the other evidence in the record, the brochure demonstrates, however, that the forum in question is suitable for speech concerning social problems and issues.

cites International Society for Krishna Consciousness, Inc. v. Lee, 505 U.S. 672 (1992). In Lee, the Court considered restrictions on solicitation and leafleting in airport terminals. The Court began by noting that the government owned and operated the airport terminals and that:

> Where the government is acting as a proprietor, managing its internal operations, rather than acting as a lawmaker with the power to regulate or license, its actions will not be subjected to the heightened review to which its actions as a lawmaker may be subject.

505 U.S. at 678 (quoting United States v. Kokinda, 497 U.S. 720, 725 (1990) (plurality opinion) (citing Cafeteria & Restaurant Workers v. McElroy, 367 U.S. 866, 896 (1961))).

In Lee, the Court went on, however, to apply the factors identified in Cornelius to determine whether the airport terminals were public fora. The Court reasoned that the city's purpose in operating the airport was to generate a profit by serving the air-traveling public. The goal of the terminal was "the facilitation of passenger air travel" and not "the promotion of expression." 505 U.S. at 682. The Court distinguished the restricted access in air terminals from other "transportation nodes," such as rail and bus stations. Id. at 681.

We do not read Lee, as SEPTA suggests, to mean that every time the government runs a commercial enterprise it has, by definition, decided not to create an open forum. To the contrary, it is the commercial and restricted nature of an airport concourse which suggested that the government did not intend the concourse to be primarily a forum for expression. See also Cornelius, 473 U.S. at 799-800.

Here, we have determined that the forum is not the SEPTA stations, but only the advertising space within the stations. We need not concern ourselves with solicitation or leafletting of the public within the stations but only with the use of the ad space itself. The nature of this forum is partly commercial, consistent with the goal of SEPTA to earn a profit on its advertising space and with CBM's offer to pay the commercial rate to lease that space. See Airline Pilots Assoc. v. Dept. of Aviation of the City of Chicago, 45 F.3d 1144, 1157 (7th Cir. 1995); Stewart v. District of

13

Columbia Armory Bd., 863 F.2d 1013, 1019 (D.C. Cir. 1988). However, SEPTA has also used the advertising space to generate a profit through expressive activity. This expressive use has not interfered with providing rail transportation facilities to the public. Thus, the nature of the forum suggests, but by no means establishes, see Lehman v. City of Shaker Heights, 418 U.S. 298, 304 (1974), that the government has dedicated the space to expression in the form of paid advertisements. See Southeastern Promotions, Limited v. Conrad, 420 U.S. 546, 555 (1975) (holding municipal theaters were "public forums designed for and dedicated to expressive activities").

With these goals in mind, we next consider SEPTA's written policy governing permissible advertising. The contract between TDI and SEPTA provides that "it is SEPTA's strong preference that [TDI] concentrate on securing advertising other than that which is tobacco and alcohol related." The contract directs that TDI use its "best efforts" to fill the space with other advertisements. Recognizing that TDI's responsibility under the contract is to "produce revenues," the contract permits the combined sale of alcohol and tobacco advertising of up to twenty percent of the annual dollar value of the advertising. TDI also, however, has an obligation to "pursue qualified public health groups, as identified by SEPTA" and to make advertising space available to them "on a one to one ratio to the tobacco and alcohol related advertising at that time, subject to space availability." In addition, the contract reserves for SEPTA the right to reject advertisements that it does not like:

> All advertising displays at any time inserted or placed by the Licensee in any display devices in any vehicle and /or locations shall be of an appropriate character and quality, and the appearance of all displays shall be acceptable to SEPTA. No libelous, slanderous, or obscene advertising maybe accepted by the Licensee for display in the Authority's transit and railroad vehicles and facilities. All advertising determined by the[sic] SEPTA, in its sole discretion, as objectionable within the meaning of this subsection must not be utilized on any SEPTA vehicle or facility. SEPTA shall have the

14

> right to immediately remove any advertising material
> which has already been applied, in the event that the
> [sic] SEPTA deems material objectionable for any
> reason, at the expense of the Licensee.

SEPTA argues that because it retained the right in its sole discretion to reject or to remove any advertisement that it deems objectionable, it did not create a public forum of any sort. The authority's own statement of its intent, however, does not resolve the public forum question. Gregoire v. Centennial School District, 907 F.2d 1366, 1374 (3d Cir. 1990) (reasoning that "intent, as evidenced by a government's statements, is a factor to be considered," but that "the forum inquiry does not end with the government's statement of intent"); see also Air Line Pilots Association, Int'l. v. Dept. of Aviation, 45 F.3d 1144, 1153-1154 (7th Cir. 1995); Stewart v. Dist. of Columbia Armory Bd., 863 F.2d 1013, 1016-1017, 1020 (D.C.Cir. 1988).

Furthermore, the fact that SEPTA has reserved for itself the right to reject ads for any reason at all does not signify, in and of itself alone, that no public forum has been created. See Gregoire, 907 F.2d at 1375. In Gregoire, we warned that "standards for inclusion and exclusion" in a limited public forum "must be unambiguous and definite" if the "concept of a designated open forum is to retain any vitality whatever." 907 F. 2d at 1375. We do not hold that the government could never, pursuant to an open-ended policy of excluding speech as it sees fit, effectively close the forum to certain speech (or maintain an entirely closed forum) through a consistent practice of so doing. But the fact that the government has reserved the right to control speech without any particular standards or goals, and without reference to the purpose of the forum, does not necessarily mean that it has not created a public forum. If anything, we must scrutinize more closely the speech that the government bans under such a protean standard. See Gregoire, 907 F.2d at 1375; id. at 1386 (Stapleton, J., dissenting); Denver Area Educational Telecommunications Consortium v. FCC, 116 S.Ct. 2374, 2414-2415 (1996) (Kennedy, J., concurring in part and dissenting in part); Lebron, 69 F.3d at 661-662 (Newman, C.J., dissenting).

15

SEPTA's purpose in operating the forum and its written policies governing access provide no conclusive answer as to whether the forum is intended to be closed or open. The goal of generating income by leasing ad space suggests that the forum may be open to those who pay the requisite fee. SEPTA has specified a few areas in which it will not freely accept advertising: alcohol and tobacco advertising beyond a specified limit and ads deemed libelous or obscene. These restrictions do not apply to the CBM posters. Beyond these limitations, there are no specific restrictions on the type of advertising that SEPTA will accept. In effect, SEPTA's reservation of the right to reject any ad for any reason does not conclusively show that it intended to keep the forum closed.

We turn now to SEPTA's past practice in using the advertising space, and the suitability of the forum to the speech in question.

       B. SEPTA's Past Practice and the Suitability of th e Forum for CBM's Ad

SEPTA has accepted a broad range of advertisements for display. These include religious messages, such as"Follow this bus to FREEDOM, Christian Bible Fellowship Church;" an ad criticizing a political candidate; and explicitly worded advertisements such as "Safe Sex Isn't" and an advertisement reminding viewers that "Virginity-It's cool to keep" and "Don't give it up to shut `em up." Indeed, many ads address topics concerning sex, family planning, and related topics. Other examples include a controversial ad campaign on AIDS education and awareness, posters stating "The Face of Adoption" "Consider Adoption" and "Every child deserves a family," and another ad reading "Pregnant? Scared? Confused? A.R.C. Can Help Call 1-800-884-4004 or (215-844-1082.)"

On the topic of abortion, SEPTA has accepted two ads. One read "Choice Hotline, For Answers to Your Questions About: Birth Control * Pregnancy * Prenatal Care * Abortion * Adoption * HIV/AIDS * Sexually Transmitted Diseases (STDs) Abortion - Making A Decision, Call State Health Line 1-800-692-7254 For Free Booklet on Fetal Development,

16

Fetus is Latin for Little one – A Little Human is a Baby, Confidential * Free." The other one addressed the health benefits of legalizing abortion: "When Abortion Was Illegal, Women Died. My Mother Was One of Them. Keep Abortion Legal and Safe. Support the Clara Bell Duvall Education Fund. 471-9110."

From the broad range of ads submitted, SEPTA has requested modification of only three. One was the large wrap-around bus ad for Haynes hosiery, which would have covered the entire bus with the picture of a "scantily clad" woman; it was too "risque." The same ad was accepted as a smaller "poster" ad on the sides of buses. SEPTA also asked for modification of an ad depicting a gun with a condom stretched over it. The text of the ad, "Safe Sex Isn't," ultimately ran without the graphics. SEPTA also requested that an advertisement for a personal injury law firm delete references to rail accidents.

We conclude then, based on SEPTA's written policies, which specifically provide for the exclusion of only a very narrow category of ads, based on SEPTA's goals of generating revenues through the sale of ad space, and based on SEPTA's practice of permitting virtually unlimited access to the forum, that SEPTA created a designated public forum. Moreover, it created a forum that is suitable for the speech in question, i.e., posters which presented messages concerning abortion and health issues. CBM paid for advertising space which had previously been used for ads on those topics. We need not define the precise boundaries of the forum, particularly concerning visual images that could be considered explicit. The topic of abortion and its health effects were, however, "encompassed within the purpose of the forum." Cornelius, 473 U.S. at 806.

SEPTA argues, however, and the district court concluded, that the instances in which SEPTA requested modification of ads demonstrate that SEPTA maintained "tight control" over the forum. This reasoning is consistent with a number of cases, holding that generally when permission is necessary before ads are posted, the government has not created a public forum. See Perry, 460 U.S. at 47. In this case, however, at least 99% of all ads are posted without

17

objection by SEPTA. As we note above, SEPTA has exercised control over only three ads, two of which had graphics to which SEPTA objected, and one of which solicited personal injury cases that could be directed against SEPTA. In one case, the concern with the graphics was unique to the wrap-around type bus ad -- concerns not implicated here. In all three cases, after negotiation with the sponsor, the ads were permitted to run with some modification.

Because of SEPTA's policy in accepting ads, including two on the specific topic in question, the argument that SEPTA has "tight control" over the forum may apply to ads which are similar to the ones for which SEPTA has required modification. That does not mean, however, that such control applies to subject matter over which SEPTA has never before exercised any restrictions. Because the forum may be limited in one way does not foreclose its status as a public forum with respect to other categories of speech. If it did, there would have been no limited public forum in Widmar, 454 U.S. at 267, or in Rosenberger, 115 S.Ct. at 2510. Both cases involved designated fora which excluded non-student groups. Nor would there have been a limited public forum in Kreimer, where the library constituted a public forum although it was open only to certain kinds expression.5

_____

5. In Denver Area Educational Telecommunications Consortium v. FCC, 116 S.Ct. 2374, 2388 (1996) (plurality opinion), the Court was troubled by how to characterize the government's decision to limit a forum to exclude certain speech. Does strict scrutiny apply, Justice Breyer asked for the plurality, if the government "builds a band shell in the park and dedicates it solely to classical music (but not to jazz)?" Justice Kennedy responded that the correct analogy to the cable system at issue was "the Government's creation of a band shell in which all types of music might be performed except rap music," and went on to say that "the provisions here are content-based discriminations in the strong sense of suppressing a certain form of expression that the Government dislikes, or otherwise wishes to exclude on account of its effects, and there is no justification for anything by strict scrutiny here." 116 S.Ct. at 2374 (Justice Kennedy, concurring and dissenting). In this case, the past practice of permitting much speech, particularly that on the topic of abortion, makes Justice Kennedy's analogy apt.

But we reiterate that the government's exercise of some restrictions on speech does not foreclose a public forum. We do not hold that merely because the government may have had a past practice of permitting some expressive activity, it has created a public forum. Standing alone, a past practice of permitting some expressive activities or "limited discourse" does not mandate that the government intended the forum as public. Cornelius, 473 U.S. at 802; Kokinda, 497 U.S. at 720; Perry, 460 U.S. at 47.6 We must look at the past practice in conjunction with the purpose of the forum. In Cornelius, although the government permitted speech in the forum, the "extensive" criteria for admission to the forum and the government's purpose in creating the forum demonstrated that the government intended the forum to be closed. 473 U.S. at 804–805; see also, Kokinda, 497 U.S. at 730; Perry, 460 U.S. at 47–48. Here, on the other hand, the purpose of the forum does not suggest that it is closed, and the breadth of permitted speech points in the opposite direction.

Moreover, there is no evidence that SEPTA rejected the ad pursuant to a new or previously existing policy to close the forum to debatable or misleading speech generally, or

_____

Our consideration of the similarity of the speech in question to speech permitted in the past is related to a determination of whether the limitation constitutes viewpoint discrimination, although here we make that inquiry only in conjunction with the other factors in the public forum analysis. We do not reach the viewpoint discrimination issue in this case. Even if we concluded that no viewpoint discrimination took place, however, this would not make the past use of the space irrelevant in determining whether the forum is public. How the forum has been used in the past is a core component of the public forum inquiry. See, e.g., Cornelius at 803–805; see also Denver Area Consortium, 116 S.Ct. at 2415 (Kennedy, J. concurring and dissenting) ("It contravenes the First Amendment to give Government a general license to single out some categories of speech for lesser protection so long as it stops short of viewpoint discrimination.").

6. In Kokinda, only four Justices concluded that no public forum had been created. Four Justices reached exactly the opposite exclusion –– a limited public forum had been created –– based in large part on the past practice of permitting speech in the forum. Kokinda, 497 U.S. at 750.

19

closed it to such speech on any particular topic of health. To the contrary, SEPTA simply argues that the forum was closed, and will be closed, to any speech that SEPTA wishes to exclude for any reason. In other words, SEPTA does not argue that the forum is closed to this particular type of speech because SEPTA views it differently from the speech it has permitted in the past. Instead, SEPTA claims the forum is closed to all speech, and that short of viewpoint discrimination, SEPTA can make any content-based restrictions it chooses. SEPTA's prior acceptance of a broad range of advertisements cuts particularly strongly against this claim. Cf. Gregoire, 907 F.2d at 1373. As Justice Kennedy reasoned in Denver Area Consortium,"[t]he power to limit or redefine forums for a legitimate purpose [citation omitted] does not allow the government to exclude certain speech or speakers from them for any reason at all." 116 S.Ct. at 2414 (Kennedy, J.) (concurring and dissenting).

The Seventh Circuit has also concluded, in a case similar to this one, that a transportation authority created a limited public forum. Planned Parenthood Ass'n v. Chicago Transit Auth., 767 F.2d 1225 (7th Cir. 1985). In Planned Parenthood, the Chicago Transit Authority ("CTA") refused to lease advertising space to Planned Parenthood for display of "abortion-related" advertisements. Although CTA had rejected an anti-Vietnam war ad (later displayed as part of a settlement agreement), and an "Impeach Nixon" placard (later displayed pursuant to court order), CTA had accepted an anti-war ad depicting "large bombs falling on a child releasing a dove with an olive branch in its beak." 767 F.2d at 1230. The court concluded that CTA had created a limited public forum, reasoning that "CTA maintains no system of control over the advertisements that it accepts ... other than the general contractual directive .... to refuse vulgar, immoral, or disreputable advertising" and that CTA "has allowed its advertising space to be used for a wide variety of commercial, public-service, public-issue, and political ads." Id. at 1232–1233. Noting as well that CTA had no policy pursuant to which the ad was excluded, the court concluded that the transportation authority had created a public forum. We are confronted with a similar factual situation in this case, and we reach the same conclusion.

20

In arguing to the contrary, SEPTA relies primarily on Cornelius v. NAACP Legal Defense and Education Fund , 473 U.S. 788,902 (1985) and Student Coalition for Peace v. Lower Merion School, 776 F.2d 431, 436 (3d Cir. 1985). In Cornelius, however, the government had a "consistent policy," spanning more than two decades, of limiting the charity drive to organizations that provided "direct health and welfare services to individuals . . .."[7] 473 U.S. at 793. The purpose of the charity drive, moreover, was to limit the disruptive effects of individual charity drives throughout the year, by "lessening the amount of expressive activity occurring on public property." Id. at 805. Here, there is no comparable "policy and practice" demonstrating that the government intended that the forum be closed to the speech at issue in this case. Indeed, the record points exactly the other way. In its efforts to generate advertising revenues, SEPTA permitted abortion-related and other controversial advertisements concerning sexuality.

In Student Coalition for Peace v. Lower Merion School, 776 F.2d 431, 436 (3d Cir. 1985), we considered the refusal of a school board to permit a "Peace Fair" on the school's athletic field or inside the boys' gymnasium. A student organization, not sponsored by the school, which advocated a bilateral nuclear freeze, sought to conduct the fair at the school. The school had permitted use of the athleticfield for a Special Olympics, for a Memorial Day service, for a "Bike Hike," and for jogging, picnics, and similar activities. 776 F.2d at 434. The board rejected the request pursuant to an unwritten, but long-standing policy of reserving the athletic field for "athletic and governmental purposes." The board noted that use of the gym could cause damage to thefloor, and offered the use of the auditorium, which the group

---

7. This policy was in effect from 1963 until 1982. Cornelius, 473 U.S. at 792. During 1982 and 1983, some legal defense funds participated in the charity drive under court order. An Executive Order issued in 1983 limited participation to "voluntary, charitable, health and welfare agencies that provide or support direct health and welfare services to individuals or their families," excluding "[a]gencies that seek to influence
the outcomes of elections or the determination of public policy through political activity or advocacy, lobbying, or litigation on behalf of parties
other than themselves." 473 U.S. at 795.

21

rejected. We concluded, because permission to use the facilities in question was not granted "as a matter of course" and because the nature of the property suggested the facilities did not have as their primary purpose expressive activities, that the government had not created a limited public forum. Id. at 436-437. The property at issue here, on the other hand, has been dedicated to expressive activity of exactly the sort in which petitioners seek to engage. Moreover, as to the subject of abortion specifically, and family planning issues generally, permission to post advertisements has been granted as a "matter of course." There is no policy, written or unwritten, pursuant to which CBM's ads were removed.

Lehman v. City of Shaker Heights, 418 U.S. 298 (1974) is similarly inapposite. In Lehman, the Court considered a ban on political advertising in the city's transit vehicles. A candidate for city council challenged the city's rejection of his ad pursuant to the city's policy, which had been in effect for 25 years. The card space, the Court reasoned, was a "commercial venture," and the city was free to limit the space to enhance commercial revenues, and to protect riders from the "blare of political propaganda." Id. at 303-304. As we have made clear, however, SEPTA has no long-standing practice of prohibiting ads like CBM's; nor does it have any policy pursuant to which the ads were removed. SEPTA's past practice is, instead, to include such ads.

Because we find that SEPTA has created a designated public forum, content-based restrictions on speech that come within the forum must pass strict scrutiny to comport with the First Amendment. Perry, 460 U.S. at 46. As the Supreme Court explained in Police Dept. of the City of Chicago v. Mosley, 408 U.S. at 92, 95, "above all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." Thus the government "may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views. And it may not select which issues are worth discussing or debating in public facilities." Id. at 96. The prohibited expression in this case, CBM's ad, falls within the scope of the forum created by

22

SEPTA. Thus, SEPTA's restriction is subject to heightened review.

SEPTA has not argued that its actions survive strict scrutiny. Accordingly, we conclude that CBM's First Amendment rights were violated when SEPTA removed CBM's ads.

V. Reasonableness of SEPTA's Restrictions

Even if the speech in question had fallen outside the limited public forum created by SEPTA, we would nonetheless conclude that SEPTA's removal of the posters violated the First Amendment because the removal was not "reasonable." When reviewing a governmental agency's limitation of speech on government property that has not been designated a public forum, the "reasonableness" of action limiting speech is gauged with reference to the nature of the forum itself. As the Supreme Court explained:

> Consideration of a forum's special attributes is relevant to the constitutionality of a regulation since the significance of the governmental interest must be assessed in light of the characteristic nature and function of the particular forum involved.

United States v. Kokinda, 497 U.S. 720, 732 (1990) (plurality opinion) (quoting Heffron v. International Society for Krishna Consciousness, 452 U.S. 640 (1981); see also, Perry, 460 U.S. at 49. The Kokinda plurality went on to hold that a ban on solicitation on postal premises was reasonable, in part because the "purpose of the forum" was "to accomplish the most efficient and effective postal delivery system." Id. at 732. Solicitation, the postal service had decided, was "inherently disruptive" of its business. Id.

Other cases also make clear that the reasonableness of the government's restriction on speech depends on the nature and purpose of the property from which it is barred. In Kreimer, for example, we considered whether regulations governing the behavior of library patrons were reasonable by evaluating to what extent the regulations were consistent with, or promoted, the purposes to which the library had been dedicated. 958 F.2d at 1262. Rules limiting disruptive behavior were deemed reasonable

23

because they constituted "perhaps the clearest and most direct way to achieve maximum library use." Id; see also, Hazelwood School Dist. v. Kuhlmeier, 484 U.S. 270, 273 (1988) (content-based restrictions on speech in school newspaper constitutional "so long as [they] are reasonably related to legitimate pedagogical concerns"); Cornelius v. NAACP Legal Defense and Educ. Fund, Inc., 473 U.S. 788, 806 (1985) (distinctions in non-public forum based on "subject matter and speaker identity" are constitutional as long they are "reasonable in light of purpose served by the forum and are viewpoint neutral"); Lee v. Intern. Soc. for Krishna Consciousness, Inc., 505 U.S. 672, 685 (1992) (O'Connor, J., concurring) (reasonableness inquiry is "whether [the restrictions on solicitation and on distribution of literature] are reasonably related to maintaining the multipurpose environment that the Port Authority has created.").

Similarly, in Lehman v. City of Shaker Heights, 418 U.S. 298, 303 (1974), the Court considered whether the city's refusal to accept political advertising on its rapid transit vehicles violated the First Amendment. The Court reasoned that

> Revenue earned from long-term commercial advertising could be jeopardized by a requirement that short-term candidacy or issue-oriented advertisements be displayed on car cards. Users would be subjected to the blare of political propaganda. There could be lurking doubts about political favoritism, and sticky administrative problems might arise in parceling out limited space to eager politicians. In these circumstances, the managerial system to limit car card space to innocuous and less controversial advertising does not rise to the dignity of a First Amendment violation.

418 U.S. at 304 (plurality opinion). The Court thus reasoned that, in order to maximize commercial revenue and eliminate concerns about political favoritism, the city could restrict the car card space to exclude political advertisement.

In this case, the district court concluded that SEPTA acted reasonably in relying on Dr. Lee's letter to remove the

24

CBM posters. However, CBM paid the commercial rate for the advertising space, just like any other advertiser, and submitted an advertisement on abortion and women's health, topics that were already the subject of other permitted advertisements. The subject of the speech, and the manner in which it was presented, were compatible with the purposes of the forum.

The plurality opinion in Kokinda warned against accepting the argument that simply because the government permitted other potentially disruptive speech on postal property, it had to permit solicitation as well. The Court reasoned that "whether or not the Service permits other forms of speech, which may or may not be disruptive, it is not unreasonable to prohibit solicitation on the ground that it is unquestionably a particular form of speech that is disruptive of business." 497 U.S. at 733.8 See also Greer v. Spock, 424 U.S. 831, 838 n.10 (1976). In this case, however, unlike Kokinda and Lehman, the government has offered no basis on which to conclude that the speech in question would interfere with the accepted purposes of the advertising space. See Lee v. Intern. Soc. for Krishna Consciousness, Inc., 505 U.S. 672, 691 (1992) (O'Connor, J. concurring) ("because I cannot see how peaceful pamphletting is incompatible with the multipurpose environment of the Port Authority airports, I cannot accept that a total ban on that activity is reasonable without an explanation as to why such a restriction `preserves the property' for the several uses to which it has been put. [citation to Perry]"); Airline Pilots Assoc. v. Dept. of Aviation, 45 F.3d 1144, 1161 (7th Cir. 1995) (Flaum, J. Concurring) ("...when the government decides who may speak based on substantive criteria, it acts as a censor. The government should not normally take on the role of deciding who may speak on what matters, regardless of what capacity in which it acts").

_____

8. Although the four Justice plurality concluded that the restriction was reasonable, three dissenting Justices concluded that even if the forum was nonpublic, the restrictions were not reasonable, in large part because the post office permitted other disruptive speech. This "inconsistent treatment," in the eyes of the dissent, "renders the prohibition on solicitation unreasonable." Kokinda, 497 U.S. 760–761 (Brennan, J. dissenting).

25

SEPTA argued before the district court that Gambaccini had testified that SEPTA "closed the debate to a situation in which there are ads or debated and dubious statements of medical fact."9 Consistent with this statement, SEPTA could have argued that based on Dr. Lee's letter, it viewed CBM's ad as "debated and dubious," and accordingly excluded it. A prohibition on "debated and dubious ads," put in place before, or because of the concerns about CBM's ad, might qualify as reasonable. We note, however, that SEPTA does not have a policy of protecting riders from "debated and dubious" speech generally, nor does SEPTA link this purported policy to its use of the forum.

In any event, we need not reach that question. Gambaccini did not testify to such a policy, implemented either before or after the removal of CBM's ad. Instead, when questioned if he would post an ad saying "women who choose abortion live longer and have less breast cancer," he answered "[N]ot unless there was some credible evidence to support it." (Appendix at 354-355). This is a different standard -- a debatable advertisement may well be supported by credible evidence. And if this standard controlled, SEPTA was unreasonable because it failed to give CBM an opportunity to produce such evidence. Moreover, Gambaccini did not explain whether this standard applied generally, or just to ads on the topic of abortion and cancer. Nor did he explain SEPTA's grounds for adopting it. SEPTA has left us to guess why, in terms of the purpose of the forum, it excluded CBM's ad, and why, and to what extent, other ads will also be excluded. This makes it difficult to evaluate the extent of the governmental interest in excluding the speech from SEPTA's property.

Finally, as we have noted, SEPTA never asked CBM-- the sponsor of the ad -- to defend its accuracy, to explain the basis for the ad, or to clarify it. Instead, SEPTA removed the ad without contacting CBM -- even though CBM had modified the poster in response to SEPTA's previous requests.

_____

9. SEPTA argued before us that it "determined not to devote its advertising areas to alarming allegations regarding cancer and abortion, given the controverted nature of the public health claim as described in the HHS letter."

26

We conclude, therefore, that under the facts presented SEPTA's actions were not reasonable. SEPTA acted as a censor, limiting speech because it found it to be "misleading." SEPTA argues that it cannot investigate the accuracy of medical claims in ads. For that reason, it relied on Dr. Lee's letter. We do not hold that SEPTA must hire its own cadre of experts to evaluate medical claims made in ads. It was SEPTA, however, which accepted advertising on a permitted topic, and then decided that CBM's ad was unacceptably misleading. Having decided to exclude the posters on this basis, SEPTA did not act reasonably when it failed to ask CBM to clarify the basis on which the claim was made. This is all the more true where SEPTA has failed to explain how its content-based distinctions are related to preserving the advertising space for its intended use, and where SEPTA has in place no policy, old or new, written or unwritten, governing the display of ads making contested claims.

VI. Conclusion

For the reasons set forth above, we will reverse district court's order granting judgment to SEPTA, and we will remand this case for further proceedings consistent with this opinion.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit